Filed 1/6/16 Unmodified opinion attached

# CERTIFIED FOR PARTIAL PUBLICATION[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>JENNELL RENEE WRIGHT,<br><br>        Defendant and Appellant. | A139881<br><br>(Contra Costa County<br>Super. Ct. No. 51014331)<br><br>**ORDER MODIFYING OPINION**<br>**AND DENYING REHEARING**<br>[NO CHANGE IN JUDGMENT] |

BY THE COURT:

It is ordered that the partially published opinion filed herein on December 15, 2015, be modified as follows:

Insert the following footnote after the first full sentence of the second full paragraph on page 51:

> To the extent defendant argues the assumed collateral estoppel error discussed in Part B of this opinion is federal constitutional error because it contributed to the removal of material factual questions from the jury (*Blakely v. Washington* (2004) 542 U.S. 296), we also find the jury's lying in wait special circumstance finding resolved any such factual questions against defendant and rendered any such error harmless beyond a reasonable doubt.  (*Washington v. Recuenco* (2006) 548 U.S. 212, 218-222.)

This modification does not change the judgment.

The petition for rehearing is denied.

Dated:                                        _____

                                                          Humes, P.J.

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts IV.A–E and H–J.

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br>v.<br>JENNELL RENEE WRIGHT,<br><br>     Defendant and Appellant. | A139881<br><br>(Contra Costa County<br>Super. Ct. No. 51014331) |

## I. INTRODUCTION

Following years of strife between Jennell Wright and her former boyfriend, Le'Mar Green, some of it centered around their three-year-old son, defendant drove to Green's home, waited for him to return from work, and shot him three times. A jury convicted defendant of first degree murder with a special circumstance finding of lying in wait.

On appeal, defendant argues the trial court erroneously failed to instruct on self-defense, imperfect self-defense and provocation/heat of passion theories of voluntary manslaughter, and on provocation as a basis for the reduction of murder from first to second degree. She also argues the evidence was insufficient to s upport the lying-in-wait special circumstance finding, the court erroneously excluded defense evidence, and a juror's postings on Facebook constituted prejudicial misconduct. We affirm.

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts IV.A–E and H–J.

## II. STATEMENT OF THE CASE

By first amended information filed July 28, 2011, the Contra Costa County District Attorney charged defendant, Jennell Renee Wright, with the special circumstance murder of Le'Mar Green while lying in wait (Penal Code,[1] §§ 187, 190.2, subd. (a)(15)), and shooting at an occupied motor vehicle (§ 246) on February 23, 2010. The information alleged that she committed each offense while personally and intentionally discharging a firearm to cause great bodily injury or death. (§ 12022.53, subds. (b), (c), & (d).)

Jury trial commenced November 7, 2011, and was submitted to the jury on December 8, 2011. The jury was instructed on self-defense (CALCRIM No. 505); right to self-defense: mutual combat or initial aggressor (CALCRIM No. 3471); right to self-defense: may not be contrived (CALCRIM No. 3472); voluntary manslaughter–heat of passion (CALCRIM No. 570); voluntary manslaughter–imperfect self-defense (CALCRIM No. 571); and provocation: effect on degree of murder (CALCRIM No. 522).

During 10 days of deliberation, the jury made several inquiries.[2] One juror was replaced by an alternate, argument to the jury was reopened, and an *Allen* charge was

---

[1] Unless otherwise specified, all statutory references are to the Penal Code.

[2] As relevant here, the jury asked:

"(1) Regarding #3471 Right to self-defense: mutual combat or initial aggressor: Must it be shown beyond a reasonable doubt that both items are true, or is it sufficient that both are reasonably possible? [¶] (2) Does #3471 apply to imperfect self-defense?

"Regarding instruction 570: [¶] If we assume that the defendant fired the first shot, may any of the victim's subsequent actions be considered provocation?

"1.a. If a homicide is determined not to be done in self-defense or defense of another (per instruction 505), is it necessarily unlawful? [¶] 1.b. I.e., are there other forms of lawful homicide that could apply in this case? [¶] 2.a. Is it possible for an unlawful homicide to not meet the requirements for either murder or manslaughter that have not been presented to us? [¶] 2.b. If so, would that mandate a verdict of 'not guilty'?

given.[3]  On January 11, 2012, the jury found defendant guilty of shooting at an occupied motor vehicle, and further found she personally and intentionally used a firearm. (§§ 246, 12022.53, subds. (b) & (c).)

The jury reached no verdict on the murder charge and made no finding on the allegation she personally and intentionally discharged a firearm causing great bodily injury or death in the commission of the section 246 charge.  The court declared a mistrial on that charge and allegation.

Jury trial before the same judge commenced January 22, 2013.  The trial court solicited briefing on the preclusive effect of the section 246 conviction on self-defense

---

"Regarding instruction 520, items #3 + 4 under implied malice:  [¶]  1.  In item #3, does 'knew' refer to knowledge gained beforehand or awareness of the moment?  [¶] 2.  Can you elaborate on the meaning of item #4, specifically the meaning of 'conscious disregard'?

"We the jury request the following:  [A]dditional arguments and clarification regarding:  [¶] -instruction 520, implied malice, in particular items #3 + 4, including interpretation of the wording therein.  [¶] –instruction 521 B. Lying in Wait.

"Instruction 500 states, 'If there is no legally valid excuse or justification, the killing is unlawful and, depending on the circumstances, the person is guilty of either murder or manslaughter.  This would seem to be untrue if we are allowed to:  [¶] 1.  Rule out lawful homicide in self-defense and manslaughter by imperfect self-defense (as initial aggressor); [¶]  2. Rule out manslaughter by heat of passion (since not provoked); AND [¶]  3. find that the evidence fails to prove the required elements of malice aforethought (due to mental state).  [¶] Please explain this apparent contradiction.

"Implied malice appears not to require intent to kill, deliberation, premeditation, or lying in wait.  Given the limitations listed in instruction 625 [Voluntary Intoxication: Effects on Homicide Crimes], may voluntary intoxication be considered when deliberating implied malice?  [¶]  If not, and if we believe that voluntary intoxication contributed to the defendant's mental state, then how exactly are we to 'not consider' it? [¶]  Are we expected somehow to speculate as to what her mental state would have been in the absence of intoxication?"

[3] *Allen v. United States* (1896) 164 U.S. 492.  The court gave an instruction approved in *People v. Moore* (2002) 96 Cal.App.4th 1105, 1118–1122.

3

and voluntary manslaughter issues. Subsequently, the court refused to instruct on self-defense, imperfect self-defense, provocation, and voluntary manslaughter.

On February 26, 2013, after one day of deliberation, the second jury returned a guilty verdict of first degree murder, found true the special circumstance that she killed while lying in wait, and the allegation she personally and intentionally discharged a firearm causing great bodily injury or death in connection with each substantive charge.

On July 26, 2013, the court sentenced defendant for murder and firearm use to life without the possibility of parole, plus 25 years to life. For shooting into an occupied vehicle and firearm use, the court sentence defendant to the midterm of five years, plus 25 years to life. The latter sentence was stayed pursuant to section 654. Defendant timely appeals.

## III. STATEMENT OF FACTS

### A. The Crime Scene

Pelican Loop in the City of Pittsburg is a secluded community of about 100 townhouses with five parking lots. On February 23, 2010, Barbara Gee returned to her home on the Loop at about 1:00 a.m. to find the body of her next-door neighbor Natasha's fiancé lying face down on the ground next to the driver's door of his car. Gee called the police. At 12:50 a.m., another resident of the Loop had been awakened by the sound of gunshots. The first shot was followed by a pause, then by two more gunshots that sounded as if they came from the parking lot. Shortly thereafter she heard a car drive out of the parking lot, pass her house going pretty fast, and turn onto Railroad Avenue.

Pittsburg police officer Jerald Lombardi arrived at Pelican Loop a few minutes after 1:22 a.m. A man's body was lying face down on the ground in the parking lot between two cars. His right hand was partially clenched into a fist. There was broken glass on the ground around the body. The car's driver's door was open and the driver's door window was shattered. There was broken glass on the floorboard and front seat, and

4

a bullet fragment on the driver's seat. There were no signs of life. The driver's license in a wallet in the man's right rear pants pocket identified him as Le'Mar Green.

Green's feet were one to one-and-a-half feet from the open doorjamb. Lombardi found a pack of cigarettes and a single burned-out cigarette butt on the ground near Green. Liquid on the ground under Green's mouth smelled of beer. There was no blood inside the car.

The keys were in the ignition, which was in an "on" position, and Lombardi could hear an audible alarm sounding an alert that the car door was open while the keys were inside the car. The engine was not running. In the center console of the car was a cold beer can about three-quarters full. Green's cell phone was found in the car.

Approximately 10 feet from the body, behind the car, was a fully loaded speed loader containing six live rounds. Seven more live rounds were on the ground. The bullets in the speedloader were Hornady .38-caliber, Special rounds, hollow tip, as were the bullets found on the ground. No empty shell casings were found, indicating a revolver was used. No weapons or additional bullet damage to the car were found.

### 1. *The Police Investigation*

The City of Pittsburg has surveillance cameras in all the major intersections that feed information to a monitoring room at the police department, where the information is recorded by computer hard drive 24 hours a day, seven days a week. A police officer on monitoring duty at the station located seemingly relevant video footage. Still photos from that footage of the vehicles leaving the scene at approximately 12:51 a.m. that morning were taken to the investigating officers at the scene.

Green's fiancée, Natasha Griffith, was located and informed of Green's death. Griffith told police that defendant was the mother of Green's three-year-old son, that Green had been ordered to pay child support in November of 2009, that defendant had been asking Green for more money, and that she had been excessively phoning and texting Green. Griffith was transported to the Pittsburg Police Department, where she

5

identified defendant from a picture the police showed her. They also showed her a picture of a car she did not recognize. She told police defendant drove a beat-up red or wine-colored automobile.

Green's mother, Lucinda Jackson, was summoned to the Pittsburg police station, where other family members were also gathered. Ms. Jackson told police the only person her son had problems with was defendant. She also identified defendant's mother's car at an intersection near Green's home in a picture the police showed her.

Police used DMV records to verify defendant's mother's car was a 1997 Toyota Avalon and matched it to the car in the surveillance video. When police later checked defendant's home in Vallejo, no one was home. Defendant's car was there, but her mother's Avalon was not. Police learned that defendant did not go to work on February 23.

Later, police inspectors learned defendant had been arrested for possessing a concealed loaded firearm at the Mar Ray motel on Railroad Avenue. Defendant had checked into the motel on February 22, 2010, after 10:00 p.m. Defendant did not appear intoxicated to the motel owner at that time.

The next morning, defendant did not check out despite several warnings. When she had not checked out by 2:30 p.m., the motel owner called the police. The responding officer told defendant she needed to leave. Defendant was moving slowly, and said she was feeling dizzy. She gathered her two bags and purse, and said her mother was coming to give her a ride.

Defendant sat outside to wait. A little while later, the motel's housekeeper reported to the motel owner that defendant had a gun. The motel owner again called the police and when the police responded shortly thereafter, he pointed out to them defendant's green Toyota Avalon. The cleaning lady pointed out live cartridges under the mattress in defendant's motel room. They were hollow-tip .38-caliber Special Hornady.

6

Defendant consented to a search of her belongings. Inside one bag was a small silver Smith and Wesson .38-caliber revolver containing six live rounds. Inside another bag were more live .38-caliber rounds. Defendant was arrested for possession of a loaded concealed firearm.

There were rounds of ammunition on the driver's seat of defendant's car, which was registered to Robbie Wright. Inside one of defendant's bags police found an Orchard Supply and Hardware sales receipt and inside her purse they found some handwritten notes, which read: "I got to get Lucinda's son and Robbie's daughter," "[i]t started with you and will end with you," and "[u]nknown what to do February 20." Inside her wallet was a debit card with Green's photo. One of her bags contained "quite a bit of ammunition," including three Hornady expended brass casings consistent with .38-caliber Hornady hollow tip bullets, and two water bottles of green liquid.

Defendant's mother, Robbie Wright, and sister, Joann Wright, arrived at the Mar Ray Motel after defendant had been taken to jail. They advised the police inspector they were afraid defendant might have attempted suicide at the motel. They were subsequently interviewed separately at the police station. The police did not tell them Green had been killed or that defendant was a suspect until after they were interviewed.

Joann Wright told the police that defendant and Green had been arguing on Saturday, February 20 when Green came to pick up their son. Joann said: "She was just real[ly] talking nasty to him and trying to provoke him to say stuff." Joann remembered thinking she hoped Green did not say anything to defendant because if he did there would be an argument.

The recording of Robbie Wright's interview was played for the jury. She lived in Vallejo with defendant and Joann. On Monday evening around 10:00 or 11:00 p.m., defendant asked Robbie if she wanted anything from the store, and Robbie said no. At 4:00 a.m. the next morning, Joann noticed Robbie's car was gone, but defendant's red Plymouth Breeze was parked in front of their house. Defendant's mother was afraid

7

defendant was going to attempt suicide again, as she had two years before, because she is mentally ill. Robbie repeatedly called defendant's cell phone and finally got an answer. Defendant said she was ready to come home, but could barely talk. Robbie noticed defendant's Prozac bottle was empty.

Robbie described defendant's previous suicide attempt in 2008 and her subsequent hospitalization and treatment. She knew that defendant and her baby's father did not get along. They argued. Robbie described them as a "a fuse . . . [w]hen they get together." She agreed with the interviewer's characterization of their relationship as "pretty volatile at times."

Robbie thought defendant was still in love with Green and wanted to get back with him. When Green moved on and started living with his new girlfriend, Natasha, it "threw her over the edge." Defendant could not accept Green's new girlfriend.

Robbie and Joann Wright allowed a search of their home. Inside defendant's bedroom the inspectors found many empty tequila bottles in the dresser drawers and on the floor, and a bottle of green antifreeze. There were three empty ammunition boxes, two for Hornady hollow point bullets and one for .38 caliber lead bullets. They also found speed-loader packaging and a daycare contract.

Robbie Wright agreed to a search of her car. Inside the car were three live .38 caliber Hornady hollow tip rounds, a half-full tequila bottle, and a partially full acetaminophen bottle.

After interviewing Robbie and Joann Wright, the inspectors tried to interview defendant in a holding cell at the jail. She was barely responsive, and very lethargic. She was seated on the floor, and could not stand up by herself. The inspector could tell something was wrong; she "appeared altered." The inspector helped her stand up and asked her what she had taken. Eventually defendant revealed she had taken a whole bottle of Prozac and ingested antifreeze. The inspector requested emergency fire and ambulance aid and verified that the officer who had searched defendant's belongings had

8

located empty pill bottles and a water bottle containing a liquid consistent with antifreeze. Defendant was transported to the hospital in a very serious condition.

### 2. *Surveillance Video Evidence*

Surveillance video from the Mar Ray Motel from 10:00 p.m. to midnight showed a vehicle entered the motel on February 22, 2010, at about 10:34 p.m. and left the premises at about 11:54 p.m.

A compilation of surveillance video from City of Pittsburg cameras at various locations showed a 1997 Toyota Avalon leaving the Mar Ray Motel on February 22, 2010, at 11:53 p.m. The car turned onto Railroad Avenue, drove through the downtown area and to Pelican Loop. Later, Green's Pontiac Grand Prix drove on Railroad Avenue through the downtown area and to Pelican Loop on February 23, 2010, at about 12:41 a.m. About 12:50 a.m., the Toyota Avalon drove from Pelican Loop with its lights off to Railroad Avenue, when its lights turned on, and drove on Railroad Avenue to the Mar Ray Motel.

Green worked from 3:30 p.m. to midnight. Normally, when Green got off work, he would buy a pack of cigarettes and a beer, then sit drinking the beer and smoking cigarettes in his Pontiac Grand Prix in the parking lot at Pelican Loop.

### 3. *The Autopsy and Ballistics Findings*

Green was six feet, five inches tall and weighed 209 pounds. He died of multiple gunshot wounds. There were three bullets in his body. One bullet entered his left chest just above the nipple. It was fired from his left and travelled to his right and sharply downward at a 45-degree angle through the third rib, left lung, heart, diaphragm, and liver, before coming to rest in the right flank. The other two bullets entered the left arm and left shoulder within inches of each other. The bullet that entered the left arm was also fired from Green's left, traveled left to right, and sharply downward as it went through the left arm, armpit, chest, left lung, heart, diaphragm, and liver before coming to rest in the right flank lower than the bullet that entered the chest. The bullet that entered

9

the left shoulder was also fired from Green's left, traveled from left to right and downward as it went through the left arm, armpit, and came to rest outside the chest wall without penetrating the chest or any organs. It was not a fatal wound. The right wrist had gunpowder stippling, which can occur within 18 inches of the gun barrel.

A firearms expert compared defendant's Smith and Wesson revolver with the bullets recovered from Green's body. The two autopsy bullets were fired from the revolver. The revolver did not have a hair trigger. The speed loader found in the parking lot was for a revolver that holds six unfired cartridges in its cylinder.

Defendant's blood samples, taken on February 23, 2010, at 8:15 p.m., tested negative for alcohol, methamphetamine, and cocaine, but positive for opiates, specifically hydrocodone. The hydrocodone was present in the lowest detectable concentration—.02 milligrams per milliliter—and could have resulted from ingestion two days prior to the test.

### 4. Defendant's Statement to Police at the Hospital

Police inspectors interviewed defendant at the hospital on February 25, 2010. The recorded interview was played for the jury.

Defendant admitted she accidentally shot Green. "I was just going to shoot at him." She bought the gun and ammunition to shoot herself. "It was just too much stress." While she was in the motel room she decided to scare Green. Defendant was angered by Green's relationship with his new girlfriend and his failure to fulfill his responsibilities with defendant's son. She waited in the parking lot for about 10 minutes before he got there. She sat and watched Green for about five minutes before going to shoot at him.

The first time she fired, she missed. The shot shattered the glass. Then he got out of his car and tried to hit her. He asked what she was doing there  When he tried to come after her she got scared. He came towards her between the two cars. She fired once or twice. She thought maybe she hit him in the leg. He fell; she ran.

10

When she got back to the motel room she took pills and drank antifreeze to kill herself. She said Green's work schedule had changed and she did not know Green would arrive while she was at the lot. Green told her where he lived, but she had never been there before.

She had some feelings for him, but she was not in love with him. She was not upset he had a new girlfriend. She did not plan to scare Green. She decided to scare Green at the motel room.

**B.    *Defendant's Relationship with Green***

Lucinda Jackson (Green's mother), Robbie Wright (defendant's mother), Joann Wright (defendant's sister), Natasha Griffith (Green's fiancée), and Andre Haywood (Green's friend), testified about defendant's stormy relationship with Green.

According to Jackson, after their son was born in 2007, Green and defendant tried to make a go of it, but they could not get along. Green moved back in with his mother in November of 2007 and lived with her until she moved away in July of 2008. Green moved back in with Jackson in February 2009, after she returned to Antioch. In March or April of 2009, Jackson asked a friend from work, Natasha Griffith, to live with her. Griffith and Green became romantically involved and eventually moved to Pelican Loop.

From 2007 through 2008, Green's relationship with defendant was stressful, tumultuous, and scary. Defendant would show up at Jackson's house regularly. If Green did not answer his phone, defendant would call Jackson. She would knock on Jackson's window and wake her up.

After Griffith moved in, there was an incident where defendant came to Jackson's house at about 10:30 p.m., dressed in dark clothing. She was very aggressive and very angry and said Green was not answering his phone. Defendant wanted to know who lived in Jackson's house and who Griffith was. After that, defendant would not let Green or Jackson see their son for four months.

11

According to Griffith, in the Fall of 2009, Green "really wanted to get custody of his son." He "took Ms. Wright to court. He served her." Jackson helped Green with his court papers to get an order for visitation and custody. During that time period, Green showed Griftith threatening text messages to him from defendant. One said she would not stop until he was six feet under. Other texts said, "I'm going to end you" and "[y]ou're going to have nothing." Eventually, defendant and Green reached a visitation agreement that Green would pick up their son from defendant every other weekend on Saturdays at 11:00 a.m. and return him to defendant on Mondays at about 2:00 p.m. before Green went to work. The exchanges were always at defendant's home in Vallejo and never at Griffith's home on Pelican Loop.

Griffith confirmed that after she moved in with defendant and his mother, defendant came to Jackson's house and tried to force her way inside. Defendant was upset, very mad, and aggressive.

After Griffith and Green moved to Pelican Loop in October 2009, Green was adamant about not letting defendant know where he lived. At that point, the relationship between defendant and Green was "very turbulent" and they were not on good terms. Their telephone conversations were "ugly."

Griffith overheard several telephone conversations between defendant and Green. From November 2009, Green argued with defendant on the phone and received threatening text messages from her. Griffith believed the arguments were triggered because defendant wanted him back, and he continued to live with Griffith. "She didn't like that at all." But there was also an ongoing battle between defendant and Green over custody, child support, and the child's care. One issue was "[t]hat he wanted his son." He was concerned because his son was terrified of water, unkempt, unable to use a fork or spoon and "appear[ed] to be slightly autistic." Green stressed that the child "needed to be checked out."

12

In August or September 2009, Green asked his friend Andre Haywood to help him serve custody papers on defendant. After Haywood handed defendant the papers, defendant told Green, "You better enjoy your son while you can."

Haywood described Green's relationship with defendant as "real shaky." Green did not want to be on the phone with defendant because they would argue. Often, Haywood could hear defendant screaming at Green on the phone. If Green did not answer his cell phone when she called, there would be 20 or 30 missed calls from her and text messages in which defendant threatened to call Green's mother's phone and wake her up, or text things like, "If you don't pick up, I'm not going to stop until you're six feet under." In 2009, when Green lived in Concord, Haywood would come over and they would work on cars for extra money. Sometimes defendant would park down the street and call him from her car.

In November 2009, defendant, her two sons, her mother, her sister, and her sister's teenage daughter moved into a six-bedroom house in Vallejo. By early 2010, that arrangement had soured. There were arguments about finances, defendant's failure to pay her fair share of the household expenses, defendant's oldest son's troubles at school, and putting Green and defendant's son in daycare. The situation was aggravated by Robbie Wright's surgery for carpal tunnel syndrome in January. Robbie was no longer able to take care of their son, and defendant had to pay for his daycare.

In January 2010, they had a birthday party for their son that Green attended. Green and defendant were still fighting. Defendant wanted to talk to Green when he was leaving the party and would not let him go. Green asked Robbie Wright to help him so he could leave. Green told Robbie where he was living but asked her not to tell defendant.

When Robbie Wright saw the yellow tape at the motel, she thought defendant had killed herself due to too much pressure. The police did not tell her otherwise before she talked to them. In addition to attempting suicide on February 23, 2008, defendant

13

also tried to kill herself at Mare Island the night after her birthday on December 26, 2009.

## C.     *Defendant's Prior Testimony*

Defendant's sworn testimony from the first trial was read to the jury by the prosecution. She first met Green in 2002. They were friends and coworkers and she started dating him in 2004. He moved in with her, her mother, and her oldest son. She became pregnant, and wanted the baby, but Green did not. She felt hurt and abandoned. They started not getting along, squabbling about various issues. She ended up not having that baby. She became stressed and depressed to the point she could not get up and complete normal tasks. She was drinking a fifth of tequila a day after work.

In 2006, defendant became pregnant again. Green did not want this child either. The couple broke up and Green went to live with his mother. That made her feel sad and hurt.

Their son was born in January 2007. She still loved Green, but she did not see him very often after their son's birth. After she gave birth, defendant started to feel more depressed. She had trouble concentrating, remembering things, getting out of bed. She was stressed about her job and financial problems. She saw a doctor at Kaiser and was prescribed Prozac, which she took without any success. She started drinking on a daily basis.

Right after she went back to work in April 2007, Green moved back in with her. He would watch their son during the day when she was at work. Their relationship was "off and on." They argued about childcare and money, and she remained depressed about her work and home life. Eventually, Green moved out again.

In March of 2008 she tried to kill herself by taking sleeping pills with alcohol. She resumed the use of Prozac. She and Green continued to argue about money and childcare. She moved to Antioch to be closer to her childcare provider. However, Green

14

was living nearby.  While she saw him infrequently, they regularly fought over childcare payments.

She started dating her supervisor, Dwayne McFadden, in January or February 2009, and they were married in August 2009.  At that time, defendant and Green were embroiled in a custody dispute that was ultimately resolved by an agreement giving both parents joint legal custody and Green visitation every other weekend.

In September 2009, defendant and Dwayne's relationship became tumultuous, and they separated.  She was drinking a fifth of tequila daily and using Vicodin, Oxycontin, and Prozac to relax and feel "normal."

In November 2009, defendant moved into a house in Vallejo with family members to ease her costs.  Her depression persisted and she continued self-medicating.  Defendant soon stopped getting along with her mother and sister.  She argued with her family about housework, money, spending time with her kids, her oldest son's bad grades.  At work, defendant sparred with her coworkers about work not getting done.  She was drinking a quart of tequila daily and taking prescription drugs.  These several stressors built up to the point she attempted suicide again in December 2009 by taking sleeping pills at the marina near Mare Island "because it was a place where nobody would find me."  She went to see a Kaiser therapist, who put her back on Prozac.

In December 2009, defendant and Green tried unsuccessfully to get together.  In November 2009 she learned Green had begun dating a girl who lived with Green's mother.  Defendant believed she was being cheated on if Green was with her and Natasha Griffith at the same time.

In January 2010, defendant was still feeling morose and having suicidal thoughts. Green threatened custody modification with their son, claiming defendant was unfit.  He was keeping their son's clothes after visits.  She did not know where Green lived, and she worried she would not know where to look for their son if Green did take him. Green refused to tell her where he currently lived.  At some point she overheard Green

15

telling his address to her sister and wrote it down so she could look it up. However, she never visited the location until the night of the shooting. Defendant denied she sent Green a text message during this time, saying, "I won't stop until you're six feet under."

In February 2010, defendant still loved Green, but she did not want him back and was not jealous of Griffith. She might have told a psychiatrist she thought she and Green were going to have sex at their son's birthday party in January 2010, but denied saying she took off her clothes and tried to seduce him. She denied telling Anita Greenwood if she could not have Green, nobody was going to have him.

By this time, defendant stopped seeing her psychiatrist because she could not afford the copayment. She resolved to kill herself on February 20 because both children would be out of the house that day. However, defendant did not kill herself on that date because her older son stayed home from school. When Green came to pick up their son that day, they did not argue.

Around this time, she wrote notes to herself, because sometimes it helped her feel better about what was going on. The notes were not all written at the same time. One note read in part: "It started with you. Will end with you. Never thought your pain was funny." Defendant explained it referred to an argument they had at the time that made her feel as if he was laughing at her. She often felt Green was mocking her "[b]ecause he wouldn't take me seriously when I tried to tell him things or I'd talk to him about things. [¶] . . . [¶] Sometimes he'd laugh. A lot of times he would do just the opposite of what I asked or what I needed done." Another note read: "What was in the beginning will be in the end." Other notes read: "I got to get Lucinda's son and Robbie's daughter," and "[u]nknown what to do, February 20th, the end." Lucinda's son was Green, and Robbie's daughter was defendant. February 20 was the day she was going to kill herself. Defendant was otherwise unable explain what these notes meant. Defendant also wrote, "It started with you and will end with you," "706 blue," "five shots," and "hollow." She did not know what those meant.

16

She was going to take pills and then shoot herself with a gun she bought for protection at the end of January from a person in the neighborhood. She bought "a lot" of hollow tip bullets because they were on sale and the salesman said they were good bullets. She bought a speed loader for the gun because the "[s]ales guy said it would help me load the gun since I didn't know anything about it."

Defendant's custody agreement with Green was that he would bring their son back on Monday, but they had a verbal agreement he would bring him back on that Sunday because defendant had already paid for childcare for the upcoming week starting Monday. Defendant worked Monday through Friday, 6:30 a.m. to 2:00 p.m. When Green did not bring their son back on Sunday, February 21, defendant worried Green was not going to bring him back in time to go to childcare on Monday. Defendant did not try to contact Green on Sunday or Monday morning to tell him what time daycare was supposed to start.

Defendant was unable to work on Monday, February 22, because she had consumed too much alcohol on Sunday. She was stressed and depressed. While she was running errands that day, Green returned their son to defendant's home. When defendant returned she saw the child in diapers without the clothes he wore when Green picked him up. This triggered defendant's fear Green was hoarding his son's clothes to facilitate his keeping the boy from her.

That night, defendant left her house about 10:00 p.m. because she was stressed and needed to go for a drive. She drove around on the freeway and ended up in Pittsburg, knowing Green lived there. She wanted to talk to him about his threats to take their son away from her. She got off the freeway at the Railroad Avenue exit, which was the closest one to Green's home. She stayed at the Mar Ray Motel, which was near both the freeway and Green's home. She was going to kill herself at the motel. She had decided to shoot herself with the gun she had obtained earlier and drink the antifreeze she had originally bought for her car. She had the loaded gun in her purse and had packed

17

her mother's travel bag with numerous bullets. She also had the speed loader fully armed and brought it with her, although she could not explain why. She had also packed her work clothes and makeup bag, in case she changed her mind.

At the Mar Ray Motel she initiated the process of suicide by drinking tequila, taking a couple of sips of antifreeze and downing Vicodin. She was not thinking about Green. She then fell asleep and woke up believing she needed to speak with Green about his threats to take her son away. She still was not thinking about hurting him. Yet she also testified she first got the idea to shoot him when she was in the motel room.

After leaving the motel, the next thing she recalled was parking the car in the front parking lot for the Pelican Loop apartments. She did not know exactly where Green lived. She parked in the front so she would not miss him if he were going by. Defendant used her mother's car because it ran better, not because Green was personally familiar with her Plymouth Breeze. While parked, she continued drinking tequila, but felt nauseous until she fell asleep again. Defendant was unsure if Green still was engaging in his habit of having a beer and some smokes before exiting his car after work. She knew this was his usual practice. His prior schedule found him off work around midnight but she was unsure of his current shift. She denied timing her trip to Green's home so she could be there when Green got home from work.

When she woke up, she saw Green sitting in his car. Defendant decided she wanted to talk to him. The next thing she remembered was standing by the driver's side window of his car. She had the gun in her hand because she "wanted him to know I was serious when I came to talk to him." "A lot of times he didn't listen and he would laugh at me when I would tell him stuff." She fired into the window "to get his attention." She was not planning to shoot him or trying to kill him.

By this time, she was feeling the effects of what she had taken, sensing a lack of control. Green "jumped out the car" and "tried to grab" her. He was leaning forward. When he got out of the car, she backed up. He was angry and called her a

18

"motherfucker." He "swung at" her with a balled fist, almost touching her. She was not sure what he was going to do; she was afraid. Thinking he would hit her, she shot. She believed she shot him twice. She shot him from a distance of less than five feet. She was not angry as she was shooting. After the last shot, Green fell. Then she ran to her car and drove off. She did not call 911 or try to get help for him.

When she got back to the motel, she drank the rest of the antifreeze and took the rest of the pills to commit suicide. In the parking lot, defendant never thought about shooting Green, then killing herself.

At the hospital, she told police Green came after her exiting the car. She told them he tried to grab her and she shot him. When she was in the parking lot, she was not thinking that she would shoot Green and then kill herself. She never told Dr. Berg it was her original plan to scare or shoot at Green, then come back to kill herself. When she spoke to Inspector Conaty and Dr. Berg, she did not get a chance to explain to them everything that happened, but she told everyone she spoke to that she did not plan to shoot Green.

She did not remember telling Dr. Ferranti repeatedly that she was angry; she may have been upset. She denied telling Dr. Ferranti that she got really angry as she got ready to shoot Green. She did not recall telling Dr. Berg she shot at Green because she was angry at him for talking crazy to her. She denied telling Dr. Berg she shot at Green because she wanted him to spend time with their son, and did not recall telling Dr. Berg she thought that if she shot near Green he would do the right thing.

Defendant denied sitting outside Green's apartment and waiting for him to come home when he lived in Concord, denied calling him at work all the time, denied putting sugar in his gas tank, egging Griffith's car, sending Green threatening texts, or trying to get at Griffith when she was at Green's mother's house.

19

**D.    Defense Evidence**

In the second trial, defendant testified again, in many ways consistently with the summary above of her testimony from the first trial. The details were similar. It is not necessary to repeat them in our discussion of the defense evidence.

Defendant did indicate Green infrequently provided her with money to help raise their son, giving her funds to purchase diapers or $100 every now and then. Only after November 2009, when the couple were involved in judicial custody proceedings, did the assistance from Green increase a bit.

Defendant also acknowledged she testified at her first trial the idea of shooting Green arose while she was at the motel before going to his home, but that was not true. "I may have misspoke, but that's not what I meant." She also recalled testifying she "never thought about it." That was true. At the motel, she was thinking about killing herself, and feeling she needed to talk first with Green. She was unable to explain why she felt that way. A video recording of defendant at the jail was also played for the jury.

Dr. Melanie Lee, a physician, treated defendant in March 2008 and February 2010 for suicide attempts. On March 6 and 7, 2008, defendant was hospitalized for an overdose of Unisom, an over-the-counter sleeping medication which contains Benadryl, and alcohol. After being discharged from the ICU, defendant was sent to an inpatient psychiatric facility and referred to a psychiatrist, Dr. Towery. Defendant's diagnosis was major depression.

Dr. Lee also saw defendant on February 24 or 25, 2010, when defendant was treated in the emergency room after taking antifreeze. Lab results showed defendant had profound metabolic acidosis and an elevated anion gap, which is consistent with ethylene glycol poisoning from ingesting antifreeze.

Dr. Towery was asked to do a psychiatric evaluation of and make a treatment recommendation for defendant. He saw her on March 7, 2008. Defendant came in following an overdose and the recommended treatment was that she be transferred for

20

inpatient psychiatric treatment after she was medically stabilized. Based on his consultation with defendant, Dr. Towery diagnosed her with major depression, single episode and recurrent. Persons suffering from major depression may have suicidal thoughts, low or no enjoyment in doing things, low energy, low motivation for doing things, low interest in things, sleep and appetite disturbance, and often a lower sense of self-esteem. Major depression may also affect cognitive function. Treatment is usually a combination of psychiatric medication and psychotherapy and generally takes place in a psychiatric hospital or other supervised setting to prevent suicide. Prozac is commonly used to treat major depression. He did not follow up with defendant after the initial consultation. He next saw defendant on February 25, 2010, when he diagnosed major depression, recurrent, and alcohol abuse/dependence. He recommended she resume taking antidepressant medication.

On December 28, 2009, at about 2:00 a.m., Officer Ritzie Tolentino found defendant in a car parked in the middle of the road on the abandoned military base on Mare Island where there were no street lights and no people. Defendant was passed out inside the vehicle with the engine and lights on. She appeared to have passed out from intoxication. After being awakened, she was unable to talk. She was booked and taken to jail.

Dr. Leland Mew, a retired emergency room doctor, treated defendant on February 23, 2010, in the hospital emergency room when she was brought in by police and paramedics. She was lethargic and unable to answer questions. Knowing beforehand she had probably overdosed on ethylene glycol, which is toxic as well as lethal, he began immediate treatment for acidosis with stomach pumping and the antidote panipisol. Tests confirmed she had metabolic acidosis, which could be caused by ingesting antifreeze.

If a female five feet four inches tall and weighing 135 pounds drank a fifth of a liter of tequila from 11:00 p.m. to 1:00 a.m., by 8:15 p.m. that evening her blood-

21

alcohol level would be at or near zero. A concentration of .02 micrograms per milliliter of hydrocodone would be at the lower end of the therapeutic range for a chronic user. Hydrocodone is an opiate contained in Vicodin. It can affect a person's cognitive abilities. Alcohol can magnify the effects of opiates.

## IV. DISCUSSION

Defendant contends the trial court erred prejudicially by failing to give requested instructions on the principles of homicide law that may reduce a first degree murder to a second degree murder or manslaughter. Specifically, the defense requested CALCRIM Nos. 505 (justifiable homicide and self-defense), 570 (voluntary manslaughter-provocation and heat of passion), 571 (voluntary manslaughter–imperfect self-defense), and 522 (provocation may reduce first degree murder to second degree murder). These instructions were given at the first trial.

The court's rationale for refusing to instruct on these principles and lesser included offenses appears to have been twofold. First, the court may have concluded the first jury's guilty verdict on count two, shooting into an occupied vehicle, precluded instruction on the issues of provocation, heat of passion, self-defense and imperfect self-defense in the second trial. Second, the court concluded defendant's testimony at both trials, viewed in light of certain ancillary principles of homicide law, established as a matter of law that self-defense, provocation, heat of passion, and imperfect self-defense were unavailable as theories of defense. As we explain, the court made several errors, but we conclude the errors do not warrant reversal.

## A. Background

After the mistrial of the murder count, the trial court began to explore ways in which the first jury's verdict might foreclose, before a second jury, litigation of the issues that had bedeviled the first jury. The trial court requested briefing on questions that assumed the jury's guilty verdict on the section 246 charge reflected a finding defendant shot into the vehicle without provocation, and asked whether that finding

22

"foreclose[d] as a matter of law" instructions on self-defense and voluntary manslaughter on retrial of the murder charge. The trial court also asked if defendant's testimony at the first trial foreclosed instructions on self-defense and voluntary manslaughter. The prosecutor argued that by virtue of its guilty verdict in count 2 (shooting at an occupied vehicle), the jury found defendant to be the aggressor who provoked the encounter. Therefore, the doctrines of imperfect self-defense and heat of passion/provocation did not apply. The prosecutor also argued that, in retrospect, defendant's testimony at the first trial did not warrant imperfect self-defense or heat of passion/provocation instructions, because she was the initial aggressor, the victim's response was justified, being fearful of getting hit and grabbed was not equivalent to imminent peril to life or great bodily injury, and she did not testify she was angry. The defense responded substantial evidence supported imperfect self-defense and voluntary manslaughter instructions, the prior jury finding did not preclude self-defense, and defendant must be given the opportunity to testify at the next trial before the court determined which instructions were warranted.

The parties and the court agreed the first jury's verdict did not limit the *evidence* to be admitted at the second trial. However, the court apparently concluded the verdict did have a preclusive effect with respect to the *issues* to be decided by the second jury, and the instructions to be given.

## B.    Collateral Estoppel

The trial court never used the term "collateral estoppel." Nevertheless, defendant argues the trial court erred in relying on that principle to preclude jury instruction on defense theories of the case. " 'Collateral estoppel' is an awkward phrase, but it stands for an extremely important principle in our adversary system of justice. It means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future

23

lawsuit." (*Ashe v. Swenson* (1970) 397 U.S. 436, 443.)[4] The Attorney General does not defend the application of collateral estoppel/issue preclusion in this case; rather, she takes the position the trial court did not apply it at all. We are not entirely persuaded that is so.

To whatever extent the court based its refusal to instruct on defense theories on some notion that the verdict and testimony from the first trial were entitled to any preclusive effect whatsoever in the second trial, the court erred. "Collateral estoppel" or issue preclusion applies in criminal cases when (1) the issue sought to be precluded from relitigation is *identical* to that decided in a former proceeding; (2) the issue was *actually litigated* in the prior proceeding; (3) the issue was *necessarily decided* in the former proceeding; (4) the decision in the former proceeding was *final* and *on the merits*; and (5) the party against whom preclusion is sought is the same as, or in privity with, the party at the former proceedings. (*Lucido v. Superior Court* (1990) 51 Cal.3d 335, 341.) Even when all these threshold requirements are met, the doctrine may not be applied if the policy considerations underlying the doctrine—"preservation of the integrity of the judicial system, promotion of judicial economy, and protection of litigants from harassment by vexatious litigation"—are outweighed by other factors, such as fairness. (*Id.* at p. 343; see *People v. Davis* (1995) 10 Cal.4th 463, 514–515, fn. 10; *Gutierrez v. Superior Court* (1994) 24 Cal.App.4th 153, 169.)

Here, none of the threshold requirements were met, save identity of parties. The issues decided by the jury's verdict on the section 246 charge were not identical to those issues left unresolved by the jury's mistrial on the murder charge. The issues of imperfect self-defense, provocation, and heat of passion were not relevant to, or actually litigated with respect to, the section 246 charge, which is a general intent crime. (*People*

---

[4] In *Ashe v. Swenson*, *supra*, 397 U.S. 436, the defendant was originally tried for the armed robbery of K., who had been victimized by several masked men in a poker game. After being *acquitted* of that charge against victim K., the defendant was then tried and *convicted* of robbing a second player in the same poker game. (*Id.* at pp. 437–440.)

24

*v. White* (2014) 230 Cal.App.4th 305, 316.)  Nor were those issues necessarily decided at the first trial.  Indeed, the first jury was unable to resolve them.  Finally, the section 246 verdict was not final.  It was still open to direct attack on appeal.  (*People v. Burns* (2011) 198 Cal.App.4th 726, 733.)

Defendant argues the error in giving preclusive effect to the verdict and testimony from the first trial requires reversal because it removed issues of perfect and imperfect self-defense, provocation and heat of passion from the jury.  However, even assuming the court improperly arrogated the factfinding function of a jury to itself, we cannot determine whether such error is prejudicial without first considering whether the trial court erred in concluding there was not sufficient evidence in the trial record to support giving the requested instructions.  We therefore review defendant's claims of asserted instructional next.

## C.  Asserted Instructional Errors

In criminal cases, even absent a request, the trial court must instruct on general principles of law relevant to the issues raised by the evidence.  (*People v. Breverman* (1998) 19 Cal.4th 142, 154.)  This obligation includes giving instructions on lesser included offenses such as manslaughter when the evidence raises a question whether all the elements of the charged offense were present, but not when there is no evidence the offense was less than that charged.  (*Ibid.*)  In the former situation, the trial court must instruct even when, as a matter of trial tactics, a defendant not only fails to request the instruction, but expressly objects to its being given.  (*People v. Banks* (2014) 59 Cal.4th 1113, 1160, disapproved on other grounds in *People v. Scott* (2015) 61 Cal.4th 363, 391, fn. 3; see *People v. Barton* (1995) 12 Cal.4th 186, 196, 199–203.)  This instructional requirement " 'prevents either party, whether by design or inadvertence, from forcing an all-or-nothing choice between conviction of the stated offense on the one hand, or complete acquittal on the other.  Hence, the rule encourages a verdict, within the charge chosen by the prosecution, that is neither "harsher [n]or more lenient than the evidence

25

merits." ' " (*People v. Smith* (2013) 57 Cal.4th 232, 239–240; accord, *People v. Banks,* at p. 1160; *People v. Campbell* (2015) 233 Cal.App.4th 148, 162.)

Instructions on lesser included offenses are required whenever evidence the defendant is guilty only of the lesser offense is "substantial enough to merit consideration" by the jury. (*People v. Flannel* (1979) 25 Cal.3d 668, 684, fn. 12.) In this context, "substantial evidence" means evidence from which a jury composed of reasonable persons could conclude the particular facts underlying the instruction existed. (*People v. Oropeza* (2007) 151 Cal.App.4th 73, 78; *People v. Salas* (2006) 37 Cal.4th 967, 982–983; accord, *People v. Barton, supra,* 12 Cal.4th at p. 201, fn. 8.) It does not mean " 'the existence of "*any* evidence, no matter how weak." ' " (*People v. Moye* (2009) 47 Cal.4th 537, 553, quoting from *People v. Flannel,* at p. 684, fn. 12.)

We review the trial court's ruling independently (*People v. Waidla* (2000) 22 Cal.4th 690, 733, 737; *People v. Licas* (2007) 41 Cal.4th 362, 366), considering the evidence in the light most favorable to the defendant. (*People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1137.) " 'Doubts as to the sufficiency of the evidence to warrant instructions should be resolved in favor of the accused,' " (*People v. Flannel*, at p. 685) and disbelief of her version of the facts is not a legitimate basis for rejecting a requested instruction since "it is the jury's function to weigh the evidence and determine credibility." (*People v. Sullivan* (1989) 215 Cal.App.3d 1446, 1452–1453; see *People v. Breverman, supra,* 19 Cal.4th at p. 162.)

The court's extensive comments at the instructional settlement conference indicate it believed defendant's first shot into the car foreclosed self-defense and imperfect self-defense instructions because defendant was the initial aggressor whose conduct created the circumstances that bestowed on Green the absolute right to respond with lethal force, and categorically deprived defendant of any right to defend herself from his attack with lethal force. (*In re Christian S.* (1994) 7 Cal 4th 768; *People v. Frandsen* (2011) 196 Cal.App.4th 266.) Shooting into the car also foreclosed

26

instructions on provocation because Green's response to the initial shot was the predictable conduct of a resisting victim, which similarly gave rise to Green's right to defend himself with lethal force and deprived defendant of the right to respond in self-defense. (*People v. Rich* (1988) 45 Cal.3d 1036.) The court also indicated it believed instructions on heat of passion/provocation manslaughter were inapplicable because words and simple assault are not legally sufficient provocation (*People v. Gutierrez* (2009) 45 Cal.4th 789), and the provocation must come from the victim, not from the defendant's personal circumstances (*People v. Steele* (2002) 27 Cal.4th 1230).

The court proposed modifications to CALCRIM Nos. 505, 522, 570, and 571, which incorporated its reasoning. However, defense counsel objected to the court's proposed modifications and the court decided not to give the instructions over objection.[5] In addition, the court believed the *victim* of an initial aggressor's assault may respond with deadly force in the face of an imminent danger of merely "*suffering bodily injury,*" whereas the defendant asserting self-defense or imperfect self-defense must be in imminent danger of "*being killed* or suffering *great* bodily injury."[6] The

---

[5] The court's modified versions of CALCRIM Nos. 505 [Justifiable Homicide: Self-defense] and 571[Voluntary Manslaughter: Imperfect Self-Defense] would have added the following language: "However, a defendant who, through her own wrongful conduct (for example, the initiation of a physical assault or the commission of a felony), has created circumstances under which her adversary's attack or pursuit is legally justified, may not claim self-defense [imperfect self-defense] . . . . Thus, if the person threatening, or appearing to threaten, to kill or inflict great bodily injury on the defendant was him- or herself acting in reasonable self-defense against the defendant's own initial aggression, the defendant does not have a right to use lethal force against that response. Only when the victim resorts to unlawful force does the defendant-aggressor regain the right of self-defense. The right of a victim to self-defense is explained in Instruction 505A."

[6] "Instruction 505A" would have provided: "A person who is the victim of an aggressive act that threatens bodily injury has a right to self-defense. A victim acts in lawful self-defense if: [¶] 1. The victim reasonably believed that he was in imminent danger of *suffering bodily injury*; [¶] 2. The victim reasonably believed that the immediate use of

27

court cited no authority for this latter proposition, and none has any been cited to us by the parties. Nor have we found any.

Defendant argues pattern self-defense instructions were supported by her testimony that she shot out the window of Green's car only to get his attention, had no intent to kill him, and *moved back* when Green got out of the car, shooting him because she "wasn't sure what he was going to do," and it happened fast. She further argues that imperfect self-defense instructions were additionally supported by her testimony from the first trial, that she did not intend or plan to shoot Green, but only to get his attention; and by her testimony, at the second trial, that she did not know why she shot into the car; she "wasn't thinking."

## D.    The Trial Court's Proposed Instructions on Self-defense Were Incorrect in Several Respects, But the Refusal to Instruct on Self-defense Was Not Error.

To warrant instructions on self-defense in this case, there must be evidence from which a reasonable jury could find that defendant (1) actually believed she needed to use deadly force against Green and (2) reasonably believed Green's actions placed her "*in imminent danger* of being killed or suffering great bodily injury." (CALCRIM No. 505;

---

force was necessary to defendant against that danger; AND [¶] 3. The victim used no more force than was reasonably necessary to defend against that danger. [¶] Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be. The victim must have believed there was imminent danger of *bodily injury* to himself. The victim's belief must have been reasonable and he must have acted only because of that belief. The victim is only entitled to use that amount of force that a reasonable person would believe is necessary in the same situation. *If the defendant used more force than was reasonable, the victim did not act in lawful self-defense.* [¶] When deciding whether the victim's beliefs were reasonable, consider all the circumstances as they were known to and appeared to the victim and consider what a reasonable person in a similar situation with similar knowledge would have believed. If the victim's beliefs were reasonable, the danger does not need to have actually existed. A victim is not required to retreat. He or she is entitled to stand his or her ground and defend himself or herself and, if reasonably necessary, to pursue an assailant until the *danger of bodily injury* has passed. This is so even if safety could have been achieved by retreating." (Italics added.) (Compare, CALCRIM No. 505.)

28

*In re Christian S., supra*, 7 Cal.4th at p. 783.) The reasonableness of the defendant's beliefs are judged by "what a reasonable person in a similar situation with similar knowledge would have believed," considering "all the circumstances as they were known to and appeared to the defendant." (CALCRIM No. 505.) Finally, there must be evidence to support the hypothesis that defendant used only "that amount of force that a reasonable person would believe is necessary in the same situation. If the defendant used more force than was reasonable, the . . . killing was not justified." (CALCRIM No. 505.)

In addition, an initial aggressor has a right to self-defense only if she actually and in good faith tried to stop fighting and indicated to her opponent by word or conduct, in a way a reasonable person would understand, that she wanted to and did stop fighting. (CALCRIM No. 3471.) The trial court's proposed instructions did not include this principle.

The court's analysis and proposed instructions here were flawed. Assuming defendant became the initial aggressor when she shot at Green through the car window, that fact did not give Green an absolute right to kill her. Under CALCRIM No. 3471, whether or not defendant had a legal right to respond depended on whether defendant's actions after Green exited his car reasonably signaled to him that she was willing to and did stop fighting. If they did, and Green nevertheless responded with deadly force, defendant regained her right to self-defense. In our view, whether defendant's act of stepping back sent such a signal was a factual question for the jury to decide, if the other requisites of self-defense were satisfied. The court's proposed instructions on self-defense would have been erroneous because they did not include this relevant principle of self-defense, and applied inconsistent standards of self-defense on the defendant and the victim.

Nevertheless, we think self-defense instructions were not warranted for a simpler reason. Even if defendant did not lose her right to self-defense as a result of shooting into Green's car, no evidence was presented from which a jury could reasonably infer that

29

defendant's use of lethal force—shooting Green twice—was objectively, reasonably necessary to defend against the danger posed to her by Green, who was unarmed. Moreover, despite two opportunities to testify and one pretrial statement to the police, defendant never said she feared for her life, or feared great bodily injury, only that she feared he might hit her, or grab her, or do something, she was not sure what. For these reasons, the refusal to give self-defense instructions was not error.

**E.     The Trial Court's Proposed Instructions on Imperfect Self-defense Were Also Incorrect in Several Respects, But the Refusal to Instruct on Imperfect Self-defense Was Not Error.**

"Imperfect self-defense is not a complete defense to homicide. However, it negates malice aforethought and thereby reduces a homicide which would otherwise be murder to voluntary manslaughter." (*People v. Curtis* (1994) 30 Cal.App.4th 1337, 1354–1355; *In re Christian S., supra,* 7 Cal.4th at p. 773; *People v. Flannel, supra,* 25 Cal.3d at pp. 679–680.) To warrant instructions on imperfect self-defense in this case, there must be evidence from which a reasonable jury could find or infer that defendant (1) actually believed she was in imminent danger of being killed or suffering great bodily injury at Green's hands, and (2) actually believed the immediate use of deadly force was necessary to defend herself from the danger posed by Green's actions, (3) but "[a]t least one of those beliefs was unreasonable." (CALCRIM No. 571.) "Put simply, the trier of fact must find an *actual* fear of an *imminent* harm. Without this finding, imperfect self-defense is no defense." (*In re Christian S.,* at p. 783.)

The trial court refused to instruct on imperfect self-defense because "[i]mperfect self-defense does not apply when the defendant, through her own wrongful conduct, has created the circumstances that justify her adversary's use of force." (*In re Christian S., supra,* 7 Cal. 4th at p. 773, fn. 1; *People v. Frandsen, supra*, 196 Cal.App.4th at p. 273.) However, the defense is available when the victim's use of force against the defendant is unlawful, even when the defendant set in motion the chain of events that led the victim to

30

attack the defendant.  (*People v. Vasquez* (2006) 136 Cal.App.4th 1176, 1179–1180; *People v. Ramirez* (2015) 233 Cal.App.4th 940, 947; *People v. Frandsen*, at p. 274; *People v. Randle* (2005) 35 Cal.4th 987, 1003.)  Just as the trial court failed to include the exception to the limitation on self-defense expressed in CALCRIM No. 3471, the trial court's modified version of CALCRIM No. 571 did not include this important exception to the limitation on imperfect self-defense.

Nevertheless, we conclude no instruction was required here.  Defendant shot into the car in which the victim was sitting, shattering the window.  This was a use of deadly force, whether she missed or whether she intended only to get his attention.  The victim jumped out of his car, swore at her, reached for her, and tried to hit her.  He was unarmed, and he did not use deadly force before she shot him twice, killing him.  Under these circumstances, there was no factual question presented whether the victim's response was unjustified or over the top.  It simply was not.  Therefore, the trial court did not err in refusing to instruct on imperfect self-defense. Also, it was not error to refuse imperfect self-defense instructions on these facts, because there was no evidentiary basis for a jury finding that defendant actually believed she was in imminent danger of being killed or greatly injured by Green.

F.      ***The Trial Court's Failure to Instruction on Provocation and Heat of Passion Manslaughter Was Error.***

Since 1872, statutory voluntary manslaughter has been defined as an unlawful killing "upon a sudden quarrel *or* heat of passion" (§ 192, subd. (a), italics added) and the malice required for murder has been implied "when no considerable provocation appears" (§ 188).  As a result, both subjectively felt heat of passion and objectively reasonable provocation are needed to negate malice and reduce a murder to manslaughter (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1143), whether the heat of passion is generated by a sudden quarrel or a series of provocative acts over a long period of time.  Thus, to warrant instructions on provocation and heat of passion, there must be

31

substantial evidence in the trial record to support a finding that, at the time of the killing, defendant's reason was (1) actually obscured as a result of a strong passion; (2) the passion was provoked by the victim's conduct; and (3) the provocation was sufficient to cause an ordinary person of average disposition to act rashly or without due deliberation and reflection, and from this passion rather than from due deliberation or reflection. (*People v. Barton, supra*, 12 Cal.4th 186, 201; *People v. Lasko* (2000) 23 Cal.4th 101, 108; *People v. Beltran* (2013) 56 Cal.4th 935, 951.) The passion aroused can be anger, rage, or any violent, intense, highly wrought or enthusiastic emotion, except revenge. (*People v. Breverman, supra,* 19 Cal.4th at p. 163.) "The provocative conduct may be physical or verbal, and it may comprise a single incident or numerous incidents over a period of time." (*People v. Le* (2007) 158 Cal.App.4th 516, 528.)

As *People v. Beltran, supra*, 56 Cal.4th 935, has recently clarified, in California the law of provocation focuses on "emotion reasonableness" (i.e., "whether 'the defendant's *emotional* outrage or *passion* was reasonable' "), not on "act reasonableness" (i.e., "whether 'a reasonable person in the defendant's shoes would have responded or *acted* as violently as the defendant did.' ") (Gruber, *A Provocative Defense* (2015) 103 Cal.L.Rev. 273, 275 & fns. 9, 10, 276, fn. 11, quoting Lee, Murder and the Reasonable Man: Passion and Fear in the Criminal Courtroom (2003 NYU Press), pp. 262–263; and citing *People v. Beltran*, at p. 945 [301 P.3d at p. 1136].) We assess the emotional profile of the defendant and its connection to the reasonableness of her reaction to the provocation rather than whether it was reasonable for her to kill under the circumstances. As the *Beltran* court explained, the California test for sufficient provocation, properly understood, has never been whether the victim's provocation would cause an ordinary person of average disposition to kill. (*People v. Beltran,* at p. 942.) "Adopting a standard requiring such provocation that the ordinary person of average disposition would be moved to *kill* focuses on the wrong thing. The proper focus is placed on the defendant's state of mind, not on his particular act. To be adequate, the

32

provocation must be one that would cause an emotion so intense that an ordinary person would simply *react*, without reflection. . . . [T]he anger or other passion must be so strong that the defendant's reaction bypassed his thought process to such an extent that judgment could not and did not intervene. Framed another way, provocation is not evaluated by whether the average person would *act* in a certain way: to kill. Instead, the question is whether the average person would *react* in a certain way: with his reason and judgment obscured." (*People v. Beltran,* at p. 949.) "[P]rovocation is sufficient [when] . . . it eclipses reflection. A person in this state simply reacts from emotion due to the provocation, without due deliberation or judgment. *If an ordinary person of average disposition, under the same circumstances, would also react in this manner, the provocation is adequate . . . .*" (*Id.* at p. 950; italics added.)

Relying on earlier antecedents, the *Beltran* court stressed that whether adequate provocation and heat of passion have been shown are fundamentally jury questions, because jurors, by virtue of their random selection and varied backgrounds and occupations, are " 'much better qualified to judge of the sufficiency and tendency of a given provocation, and much more likely to fix, with some degree of accuracy, the standard of what constitutes the average of ordinary human nature, than the judge whose habits and course of life give him much less experience of the workings of passion in the actual conflicts of life.' " (*People v. Beltran, supra*, 56 Cal.4th at p. 948, quoting from *Maher v. People* (1862) 10 Mich. 212, 222.)

Apparently focused exclusively on the second and third shots during the confrontation in the parking lot, the trial court refused to instruct on provocation and/or heat of passion, either as a means of reducing murder to manslaughter, or reducing first degree murder to second degree murder. The trial court reasoned such instructions were inapplicable because Green's actions after being shot at in his car were the predictable conduct of a victim resisting the defendant's conduct. (*People v. Rich, supra*, 45 Cal.3d

33

1036.)[7]  In the court's view, such instructions were also inapplicable because words and simple assault are not legally sufficient provocation (*People v. Gutierrez, supra*, 45 Cal.4th 789) and because the provocation must come from the victim, not from the defendant's personal circumstances (*People v. Steele*, *supra*, 27 Cal.4th 1230).

Defendant argues the trial court's focus on the shooting alone was too narrow, and that abundant evidence adduced at trial about the acrimonious relationship between defendant and Green, particularly concerning their ongoing custody battle over their son, provided a substantial evidentiary basis for voluntary manslaughter instructions premised on a provocation/ heat of passion theory.  We agree.

In light of the concurrence, it is worth reiterating we review the evidentiary support for an instruction "in the light most favorable to the defendant" (*People v. Millbrook, supra*, 222 Cal.App.4th at p. 1137) and should resolve doubts as to the sufficiency of the evidence to warrant instructions "in favor of the accused."  (*People v. Flannel, supra*, 25 Cal.3d at p. 685.)  Here, the evidence adduced at the first trial was deemed sufficient to warrant provocation/heat of passion instructions.  As a result, one of the defense theories for a manslaughter verdict advanced at the first trial was that Green's repeated threats to take custody of their son away from defendant, which came to a head the weekend when Green returned him in a diaper and without his regular clothing, provoked in her emotions of intense fear, anxiety, hopelessness, depression and anger

---

[7] The court's modified versions of CALCRIM Nos. 571 [Voluntary Manslaughter: Heat of Passion] and 522 [Provocation: Effect on Degree of Murder] would have included the following italicized language: "The defendant killed someone because of a sudden quarrel or in the heat of passion if: 1. The defendant was provoked *by the victim's conduct that was not a legal or predictable response to initial aggression by the defendant*."  (CALCRIM No. 570.)  *"[I]f the defendant was the initial aggressor, legal and predictable conduct by a victim resisting the defendant's aggression is not provocation sufficient to reduce first degree murder to second degree murder, or to reduce a murder charge to voluntary manslaughter. . . .  Legal conduct includes a victim's self-defense as explained in Instruction 505A."* (CALCRIM No. 522.)

that obscured her reason.[8]  Defense counsel argued the jury's proper focus was on defendant's state of mind; when she drove to Pelican Loop and shot Green she was consumed with thoughts about Green's threats to take custody of her son away from her.[9] The trial court was thus on notice that defendant's provocation/heat of passion theory

---

[8] Some feminist scholars posit that jurists inevitably infuse objectively reasonable provocation with male attributes and may fail to accommodate "the emotions that drive women to kill—fear, depression, and sadness rather than anger.  Additionally, the ways in which women develop these emotions may differ from the 'snapped' scenario." [Fns. omitted].  Thus, "provocation law should accept a variety of emotions as constituting 'passion,' and permit women to argue that provocation can develop over time.  [Fn. omitted.]" (*Gruber*, *supra*, 103 Cal.L.Rev. at p. 285 & fns. 80, 81, 82, 83.)

[9] Defense counsel argued: "[I]t should come as no surprise that what I tell you your focus should be is going to be completely different from what [the prosecutor] has told you your focus should be.  [¶]  And she said that this is about Mr. Green . . . .  [¶]  . . . It's not about Mr. Green.  It's about her.  It's about delving into her mind. . . .  [S]he did kill him, but there's more to focus on than the act."

"[Y]ou have to go to that place where you have a person who is in a state where she's ready to kill herself but is thinking he's going to take away my son.  I'm going to talk to him first. . . .  [¶] But, again, at this point as she told you she wasn't planning to kill him, but's [*sic*] what she was thinking is, I want to go out there and see—I need to go and see if he's serious about taking [my son] away from me, and I want him to know that I'm serious about it. Does that make any sense?  [¶]  I asked her, this thing that she was thinking at the time, no, it doesn't make any sense to her now.  But at the time—and remember that note about her feelings, about how she had never embarrassed him . . . .  [¶]  Think back, by the way, to the testimony of Natasha Griffith when I asked her . . . [¶]. . .  [¶] 'Well, did he ever—did he ever criticize her parenting skills?'  [¶] 'Yes.'  [¶] And just think.  Here's a woman who loves her child, and she was cross-examined pretty harshly on that, on the things that she was doing in being a bad mom.  But every day she gets up, she goes to work even though she's depressed.  She takes care of her kids.  She wants to kill herself.  She keeps living, and she takes care of her kids.  [¶]  And she's not thinking when she goes out there and is thinking, I want him to know that I'm serious.  I don't want him to laugh at me.  l want him to know that I'm serious, and I want to know if he's serious about trying to take [my son] away from me.  So she goes there and she gets there.

"She wasn't thinking, I'm going to attack him, I'm going to kill him, I'm going to catch him off guard.  She was thinking up until the moment that it happened, I wanted to talk to him and I wanted him to know that I was serious.  And if she hadn't been in this state, it wouldn't have happened."

35

hinged not on a "sudden quarrel" in the parking lot but on a provocatory course of conduct on Green's part relating to their child.

At the second trial, considerable evidence was once again adduced to support this theory. Persons other than defendant testified about the contentious relationship between defendant and Green, much of which revolved around their son's care and custody. The evidence showed that sometime after Griffith moved in with Jackson and Green in the spring of 2009, defendant would not let Jackson or Green see her son for several months. In response, Green filed for custody of their son, with Jackson's help. According to Griffith, too, Green really wanted to get custody of his son and he took defendant to court to get custody. The court battle ended in November or December 2009 with defendant sharing legal custody with Green and keeping physical custody, with visitation for Green. Nevertheless, defendant testified that in January 2010 Green again started threatening to take custody of her son away from her and she feared he would actually do it one day. Griffith corroborated that defendant's fear was not unwarranted: she testified that since November 2009, Green had been arguing with defendant. Griffith believed the arguments were partly about the ongoing battle between defendant and Green over custody, child support, and their son's care. One issue was "[t]hat he wanted his son." Green accused defendant of not potty training their son. He was concerned because in addition to not being potty trained, the child was terrified of water, unkempt, unable to use a fork or spoon and "appear[ed] to be slightly autistic." Green stressed to Griffith that the child "needed to be checked out."

At the first trial, defendant testified it upset her that Green thought she was an unfit mother. Green, along with her mother and sister, made her feel like a bad mother, and that added to her stress. On Saturday, February 20, when Green came to pick up their son, defendant and Green argued, according to defendant's sister. According to defendant's mother, when Green brought the boy back in a diaper after the visit, defendant was upset. Defendant testified at the second trial she was concerned when she

36

saw her son in a diaper instead of a pull-up, because she feared he would regress in his potty training. She was also concerned because the child was not wearing the clothes she had packed for him; she was afraid Green was keeping the boy's clothes at his house "[s]o that when he kept him, he'd have clothes for him."

Defendant testified at both trials that on February 22, she was only going to talk to Green about his threats to take her son away from her. At the second trial, she testified Green threatened this "[a]ll the time," sometimes daily, or when he came to get the child every other week. His threats added to the stress she was already feeling.

At both trials, defendant testified she took the gun when she went to talk to him because she wanted him to know she was serious about "him not taking [my son] from me." "A lot of times he didn't listen and he would laugh at me when I would tell him stuff." At the second trial she said, "I didn't think he would listen to me any other way." At the first trial, she said she fired into the window of his car "to get his attention." At the second trial she said she did not know why she shot into the car; she "wasn't thinking," not even about Green wanting to take her son away.

At the hospital after her arrest, defendant told police inspectors she was angry about his relationship with his new girlfriend and his failure to fulfill his responsibilities with his son. She said "[i]t was just too much stress."

At the first trial, the prosecutor's cross-examination of defendant suggested defendant told two doctors she was angry before she shot Green. She admitted only that she may have been upset. She also testified she was not angry as she fired two shots at Green. She felt she was not in control of herself. At both trials, defendant testified she did not remember driving from the motel to the victim's home on Pelican Loop or walking from her car to his.

In our view, the evidence adduced at trial was sufficient to raise a factual question whether defendant was acting under the heat of passion provoked by Green's repeated threats to take custody of her son away from her when she shot him. Cases dealing with

37

provocation have considered behavior patterns that developed over a "provocatory" period as opposed to sudden and heightened instigative situations. One exemplar of the provocative period precedent is *People v. Borchers* (1958) 50 Cal.2d 321 (*Borchers*), where the 45-year-old defendant realized his girlfriend, Dotty, age 29, was cheating on him during their May-October relationship. "From the evidence viewed as a whole the trial judge could well have concluded that defendant was roused to a heat of 'passion' *by a series of events over a considerable period of time*: Dotty's admitted infidelity, her statements that she wished she were dead, her attempt to jump from the car on the trip to San Diego, her repeated urging that defendant shoot her, [her son] and himself on the night of the homicide, and her taunt, 'are you chicken.' " (*Id*. at pp. 328–329.) "[T]he evidence . . . supports a finding that defendant killed in wild desperation induced by Dotty's *long continued provocatory* conduct." (*Id*. at p. 329, italics added.)

Similarly, in *People v. Bridgehouse* (1956) 47 Cal.2d 406 (*Bridgehouse*), the defendant filed for divorce after learning of his wife's long-standing infidelity, and obtained a restraining order prohibiting her from seeing her lover in the presence of their minor child. After the restraining order was served, "Mrs. Bridgehouse told him that she would fight his divorce action and would not hesitate to lie or use any other methods in so doing; that she would kill him if he tried to take the children away from her." (*Id.* at p. 408.) However, she was not sure she wanted to leave her lover. The next day, the defendant took their small son to his mother-in-law's house. His wife's lover was sitting in the den of his mother-in-law's house, reading. Either the defendant or the lover said, "Hi, Bill." Then the defendant shot him five or six times. (*Id.* at p. 409.) On these facts, the Supreme Court reversed the defendant's second degree murder conviction for insufficient evidence, noting that in light of the wife's affair and her refusal to either agree to divorce or forgo seeing the victim, "the sight of the victim in his mother-in-law's home was a great shock to the defendant who had not expected to see him there or anywhere else. . . . There was ample, uncontradicted, evidence that defendant was a man

38

of excellent character; that he was mentally and emotionally exhausted and was white and shaking. It appears to us, as a matter of law, that under the circumstances here presented there was adequate provocation to provoke in the reasonable man such a heat of passion as would render an ordinary man of average disposition likely to act rashly or without due deliberation and reflection." (*Id*. at pp. 413–414.)

In another relevant case, *People v. Berry* (1976) 18 Cal.3d 509 (*Berry*), defendant, age 46, killed his wife, age 20. The victim lived with the defendant from July 13 to July 26, and during the period she "continually provoked defendant with sexual taunts and incitements, alternating acceptance and rejection of him. This conduct was accompanied by repeated references to her involvement with another man; it led defendant to choke her on two occasions, until finally she achieved her unconscious desire and was strangled." (*Id*. at p. 514.) Under *Berry's* provocation evidence, even a cooling off period of 20 hours would not cancel the "long course of provocatory conduct." (*Id.* at p. 516.)

Finally, in *People v. Wharton* (1991) 53 Cal.3d 522 (*Wharton*), the defendant hit his girlfriend in the head with a blunt instrument, killing her. He told police they were both drinking heavily and arguing. She threw a book at him and he hit her while in a rage. He then tried to kill himself by inhaling gas from the oven and taking pills. (*Id*. at p. 543.) The defense presented evidence of the defendant's volatile relationship with the victim; weeks before the killing, the defendant confided to two psychiatrists that "tension between defendant and Smith was building and . . . defendant felt he was losing control of his anger toward Smith." (*Id.* at p. 572.)

The jury was instructed on basic principles of provocation and heat of passion manslaughter, but the *Wharton* court held the trial court also should have given a defense-requested instruction that "legally adequate provocation could occur over a considerable period of time." (*Wharton, supra*, 53 Cal.3d at p. 571.) From *Borchers*, *Berry* and *Bridgehouse*, the *Wharton* court distilled the principle that "[t]he key element is not the duration of the source of provocation but ' "whether or not defendant's reason

39

was, at the time of his act, so disturbed or obscured by some passion . . . to such an extent as would render ordinary men of average disposition liable to act rashly or without due deliberation and reflection, and from this passion rather than from judgment." ' " (*Id*. at pp. 569–570, quoting *People v. Rich, supra*, 45 Cal.3d at p. 1112.) "It was defendant's theory at trial that no single action on the part of the victim provoked the fatal blow but that the book-throwing incident was merely the culmination of his pent-up frustration and anger emanating from his ongoing dysfunctional relationship with the victim. In other words, his defense theory at trial was that he killed after enduring provocatory conduct by the victim over a period of weeks." (*Wharton*, at p. 571; see also *People v. Thompkins* (1987) 195 Cal.App.3d 244, 256–257 & fn. 7.)

Against this factual and legal background, the trial court's reliance on *Steele, Gutierrez*, and *Rich* was misplaced. In *People v. Steele, supra,* 27 Cal.4th 1230, the defense *conceded* there was "no evidence of provocation in the sense of a quarrel," but argued "provocation" was just a "shorthand expression" for killing while subjectively under a "heat of passion" for which there was abundant evidence. (*Id*. at p. 1251.) The *Steele* court rejected the argument. (*Ibid*.) Here, by contrast there was concrete evidence of both provocation from the victim—Green's repeated threats to take custody of their son away from defendant—and her angry, confused response to those threats, both of which were corroborated by prosecution witnesses.

*People v. Gutierrez, supra*, 45 Cal.4th 789, is similarly inapposite in this situation. *Gutierrez* did not involve a course of provocatory conduct by the victim over a considerable period of time. On the other hand, numerous well-established precedents recognize that "provocative conduct by the victim may be physical or verbal." (*People v. Manriquez* (2005) 37 Cal.4th 547, 583–584, citing *People v. Valentine* (1946) 28 Cal.2d 121, 138–139; *Berry, supra*, 18 Cal.3d at p. 515; *People v. Lee* (1999) 20 Cal.4th 47, 59; *People v. Beltran, supra*, 56 Cal.4th at pp. 948–949.)

40

The concurrence agrees the evidence here shows "a course of provocation that built up over time." (Conc. opn. of Humes, J., at p. 70.) It also acknowledges the *Bridgehouse-Borchers-Berry-Wharton* line of cases. But it disagrees that case law gives rise to a need for either a manslaughter or second degree murder provocation instruction here, because it views those cases as dependent upon a showing that "the built-up provocation culminated in *some* event involving the killer and victim that . . . caused a passionate or immediate reaction resulting in the killing." (Conc. opn. of Humes, J., at p. 70.) The concurrence points out that in *Borchers*, immediately before he shot her, the girlfriend gave the defendant her gun and dared him to shoot her. But, as quoted earlier, the *Borchers* court did not view that taunt in isolation as an act that triggered a sudden quarrel. Rather, it viewed the evidence "as a whole" and treated the final taunt (final because he killed her) as part of "Dotty's long continued provocatory conduct." (*Borchers*, *supra*, 50 Cal.2d at pp. 328–329)

Similarly, in *Berry*, the defendant fatally strangled his wife in an uncontrollable rage when she started screaming and would not stop. (*Berry, supra*, 18 Cal.3d at pp. 513–514.) Relying on *Borchers*, the *Berry* court ruled the defendant was entitled to a manslaughter instruction on these facts, not because he immediately killed his wife upon hearing her scream (nor upon her preceding statement, "I suppose you have come here to kill me"), but because there was "ample evidence in the record to support the conclusion that this passion was the result of the long course of provocatory conduct by Rachel." (*Berry,* at p. 516.) Likewise, the book-throwing incident in *Wharton* was not the reason our Supreme Court ruled the trial court should have given defendant's pinpoint instruction that provocation can develop over a considerable period of time. We agree with the concurrence that, standing alone, each of the instigative acts described above— or the diaper and disappearing clothing discovery in this case—are too trivial to support heat of provocation/passion instructions. However, we disagree that the provocatory course of conduct theory of heat of passion/ provocation always requires the existence of

41

some instigative final act, however trivial, before it is worthy of consideration by the jury.

The concurrence stresses that, in this case, "there still must be *something*— certainly something more than just quietly sitting in one's car, by one's home, minding one's own business—that incites the passionate or immediate reaction that causes the killing." (Conc. opn. of Humes, J., at p. 72.) But, in *Bridgehouse*, the victim—wife's lover—was just sitting in defendant's mother-in-law's den, reading the paper, when defendant shot him dead. Our Supreme Court reduced *Bridgehouse*'s second degree murder conviction to voluntary manslaughter because the sum total of the circumstances proved, as a matter of law, the existence of adequate provocation and heat of passion. (*Bridgehouse*, *supra*, 47 Cal.2d at p. 414.) The concurrence questions the continued vitality of *Bridgehouse* because it was the *wife*'s conduct that was provocatory, not the victim's, and the provocation must come from the victim; but we are not so sure. The facts recited in the opinion make clear Bridgehouse considered the conduct of both his wife and her lover reprehensible and provocatory. "There is testimony by defendant's neighbors that Bahr's car was often seen standing all night, or the major portion thereof, in front of the Bridgehouse home." (*Bridgehouse*, at p. 408.) "The record also showed that defendant's wife and Bahr had a joint bank account which was known to defendant; that one of defendant's charge accounts had been used to buy a gift for Bahr; that defendant had found Bahr's clothing hanging in the closets of his home . . . . When defendant was asked what his feeling was concerning Bahr, he answered: "I tried very much to make a non-entity out of him in my own mind, in my mind's eye. I knew from various sources that he was not the kind of person whom I could consider an upright, solid citizen." (*Bridgehouse*, at p. 411.) In any event, to date *Bridgehouse* remains one of the foundational cases establishing the provocatory course of conduct theory of manslaughter in California, and it has never been questioned or disapproved on that

42

ground by the California Supreme Court.[10]  We therefore think it retains precedential value.  (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450.)

The concurrence does not consider Green's act of bringing their son home one day later than they had agreed, in a diaper, dressed in clothes other than those she sent with him for the visit, a sufficiently provoking instigatory event because (1) it occurred on Monday afternoon, February 22, and defendant shot Green shortly after midnight on Tuesday, February 23; (2) it did not trigger in defendant a sufficiently passionate emotion; and (3) even if it did cause a passionate response, "insufficient evidence was presented that [Wright] was *still* under the influence of that emotion when she fired the first shot." (Conc. opn. of Humes, J., at p. 70, fn. 15.)  But the evidence showed defendant spent Sunday and Monday stewing in her own juices, debating whether to kill herself or talk to Green first, then kill herself.  In *Berry*, *supra*, 18 Cal.3d 509, our Supreme Court did not consider the 20 hours defendant waited in the apartment for Rachel's return too lengthy a cooling off period to allow for jury consideration of a manslaughter verdict, in light of the "long course of provocatory conduct" lasting two weeks.  (*Berry*, at p. 516).  In our view, the question in this case—whether 8 hours between the last provocatory act and the killing constituted sufficient time for passion to subside and reason to return, after a provocatory course of conduct lasting several months—like basic questions about the existence of provocation and its effect, if any, upon the defendant's mind—is a question of fact for the jury.  (*People v. Taylor* (1961) 197 Cal.App.2d 372, 380; *People v. Wickersham* (1982) 32 Cal.3d 307, 327, overruled on another point in *People v. Barton*, *supra*, 12 Cal.4th at p. 201.)

The concurrence also does not consider the evidence here jury-worthy because defendant "did not kill as an *immediate* response to provocatory conduct" (conc. opn. of

---

[10] *People v. Blakeley* (2000) 23 Cal.4th 82, 89 and *People v. Lasko* (2000) 23 Cal.4th 101, 110 disapproved dictum in *Bridgehouse*, *supra*, 47 Cal.2d 406 that voluntary manslaughter requires an intent to kill.

Humes, J., at p. 70, fn. 15).  The concurrence stresses the immediacy of the response in reliance upon the following statement in *People v. Wickersham, supra*, 32 Cal.3d at page 329:  "[W]here the evidence of provocation would justify a jury determination that the accused had formed the intent to kill as a direct response to the provocation and had acted immediately, the trial court is required to give instructions on second degree murder *under this theory*."  (Italics added.)  The *Wickersham* court explained that the evidence of heated words and a struggle *in that case* could have raised a reasonable doubt about whether the defendant planned the killing in advance; or the jury could have found that the defendant did not form the intent to kill until after the victim came toward her and tried to grab the gun; or the jury could have found the defendant did not premeditate "but rather acted upon a 'sudden and unconsidered impulse[].' " (*Wickersham*, at pp. 329–330.)

  *Wickersham's* discussion relied on *People v. Valentine, supra*, 28 Cal.2d 121, for the principle that "provocation which is not 'adequate' to reduce the class of the offense [from murder to manslaughter] may nevertheless raise a reasonable doubt that the defendant formed the intent to kill upon, and carried it out after, deliberation and premeditation." (*People v. Valentine, supra*, 28 Cal.2d at p. 132.)  *Valentine* arguably did not involve an immediate response to provocation, although it did involve an argument. (*Id.* at pp. 127–129.)  Defendant testified he went back to his house to get his gun between the first and last confrontation with the victim, and shot the victim during an argument after the victim swung at him. (*Id.* at p. 130.)  *Valentine* labeled "manifestly erroneous" an instruction that "[i]t is not less murder because the act is done suddenly after the intent to commit the homicide is formed.  It is sufficient that the *malicious intention* precedes and accompanies the act of homicide.' (Italics added.)" (*Valentine*, at p. 134.)  Thus, *Valentine*—and by extension *Wickersham*—stand, at most, for the proposition that provocation can negate the inference of malice arising from an act done immediately after the intent to kill is formed.  Neither *Valentine* nor *Wickersham*, *supra*,

44

32 Cal.3d 307, address provocation in the context of a long period of provocatory conduct or, in our view, imposed an immediacy requirement in that scenario.

Finally, with a nod to footnote 8 in the majority opinion, the concurring opinion dismisses *Borchers*, *Bridgehouse* and *Berry* as cases based on "obliquely sexist reasoning" and questions whether "if the defendants in these cases had been women" the courts would have "so quickly concluded that ordinary people in their position would have had their judgment eclipsed by passion due, in significant part, to their partners' infidelity." (Conc. opn. of Humes, J., at p. 72, fn. 16.) The concurrence concludes the evidence here was not jury-worthy because "Green's conduct before the shooting was insufficient to prompt a passionate response in any reasonable person, woman or man, in Wright's circumstances." (Conc. opn. of Humes, J., at p. 72, fn. 16.) But we think these observations miss the mark. The question is not whether *neither* male *nor* female killers—or both—should be able to have a jury consider whether an intimate partner's infidelities can provoke in them a killing rage, but whether *this* jury should have been able to consider whether Green's provocatory course of conduct, and the fear, depression, and sadness, rather than rage and anger, that resulted from it, could have driven Wright to act rashly, even though those provocative acts and emotions may be *different* from the ones that may drive men to act rashly. (*Gruber*, *supra*, 103 Calif. L. Rev. at p. 285 & fns. 80, 81, 82, 83; *Borchers, supra*, 50 Cal.2d at pp. 328-329.)[11]

---

[11] In the related context of battered women's syndrome evidence (renamed "intimate partner battering" to make it gender neutral (Evid. Code, § 1107, subd. (f)), case law recognizes that supporting instructions on self defense are appropriate when the evidence shows a woman killed her intimate partner after being battered by him over a long period of time, even when the victim was asleep, as in *People v. Aris* (1989) 215 Cal.App.3d 1176, disapproved on another point in *People v. Humphrey* (1996) 13 Cal.4th 1073, 1089. The objective reasonableness required for self defense is not all that different from the objective reasonableness required for provocation, as our supreme court recognized in *People v. Enraca* (2012) 53 Cal.4th 735 when it quoted *Humphrey* to illustrate the reasonable person standard applicable to provocation. "The standard is not the reaction

45

As discussed above, the trial court was willing to instruct on provocation only if the jury was also instructed that "*if the defendant was the initial aggressor*, legal and predictable conduct by a victim resisting the defendant's aggression is not provocation sufficient to reduce first degree murder to second degree murder, or to reduce a murder charge to voluntary manslaughter. . . *Legal conduct includes a victim's self-defense as explained in Instruction 505A*." (Italics added.) As noted elsewhere, the trial court's view of a victim's right to self-defense is not supportable; nor is the court's cross-pollination of the law governing provocation with "initial aggressor" rules. The refusal to instruct on provocation without including the self-defense gloss was therefore error. In addition, we conclude the kernel principle, that a resisting victim's predictable conduct cannot establish the provocation needed for voluntary manslaughter, had no application to defendant's theory of provocation in this case.

The "predictable conduct" principle apparently arises from *People v. Jackson* (1980) 28 Cal.3d 264, overruled on another point in *In re Sassounian* (1995) 9 Cal.4th 535, 545, footnote 6, and *People v. Cromer* (2001) 24 Cal.4th 889, 901, footnote 3. The *Jackson* court *distinguished* the provocative course of conduct and heat of passion present in *Berry, supra*, 18 Cal.3d 509 from the case before it, where the record indicated "that defendant may have become enraged and brutally attacked and killed one of his elderly victims because she awakened during the burglary and began to scream. No case has ever suggested, however, that such predictable conduct by a resisting victim would constitute the kind of provocation sufficient to reduce a murder charge to voluntary manslaughter." (*Jackson*, at p. 306.)

In *People v. Rich, supra*, 45 Cal.3d 1036, the court applied the *Jackson* principle to reject the assertion that "the victims' resistance to being raped could have provoked

of a 'reasonable gang member.'" (*Enraca*, at p. 759, quoting *People v. Humphrey,* at p.1087.)

46

defendant to explode." *(Id.* at p. 1112; see *People v. Dixon* (1995) 32 Cal.App.4th 1547, 1554 [victim's refusal to have sex after having been given drugs].)

In *People v. Balderas* (1985) 41 Cal.3d 144, 196, the asserted provocation was the victim's resistance to being robbed. In *People v. Blacksher* (2011) 52 Cal.4th 769, 833, the asserted provocation for shooting the victim was her predictable response of coming to the aid of another shooting victim. In *People v. Kanawyer* (2003) 113 Cal.App.4th 1233, 1247, the asserted provocation came from the victim's predictable conduct of screaming for the intruder to leave his house and for his wife to call the police. In *People v. Souza* (2012) 54 Cal.4th 90, 117, the victim was shot after he stood up from the couch and reached for one of three unknown armed men who forcibly entered the house. In *People v. Thomas* (2012) 53 Cal.4th 771, 781, the defendant placed his gun between the victim's eyes and threatened "to blow [his] brains out," then shot the victim in a rage after the victim grabbed for his gun. In each case, the victims' resistance was to the defendant's felonious conduct that preceded the lethal assault. More importantly, in all of these cases, no theory of provocation was presented at trial—no sudden quarrel, no simmering response to a provocatory course of conduct—other than the victims' predictable reactions to the defendants' assaults; thus, there was no rational basis for a jury finding of provocation. It is true that in both *Blacksher* and *Kanawyer* there was evidence of a history of bad blood between the mentally ill defendants and their victims, who were family members, but neither court tied its discussion of the predictable conduct principle to that history or to the defense theory that the defendant killed his victim in a heat of passion aroused by a history of provocative acts by the victim.

None of these cases suggests the "predictable conduct" principle should preclude the jury's consideration of a defense theory that defendant's heat of passion was ignited by a series of provocative acts on the part of the victim over a considerable period of time.

47

The concurrence does not buy defendant's argument, raised for the first time in the reply brief, that " '[b]ased on the history of violence between the parties, heat of passion may have come into play in [her] decision to fire the second and third rounds.' " (Conc. opn. of Humes, J., at p. 73.) We wish to make clear, we do not buy it either. In the first place, as discussed elsewhere, there was no admissible evidence of violence between the parties. Furthermore, even if there were a factual predicate for it, the argument would be barred by proper application of the predictable conduct cases discussed above. For that reason, we think if the trial court's proposed instruction had been limited to the fatal confrontation in the parking lot, or accompanied by a *Wharton* instruction (*Wharton*, *supra*, 53 Cal.3d 522) that provocation can develop over a considerable period of time, the court's instruction might have been acceptable.[12] What was not acceptable was depriving defendant of her only defense to murder, since her only other defense— intoxication and mental disease—could not reduce murder to voluntary manslaughter. (*People v. Saille* (1991) 54 Cal.3d 1103, 1117.) In sum, our independent review of the law and the facts leads to the conclusion it was error for the court to refuse to give requested manslaughter instructions premised on heat of passion/provocation in this case.

## G. The Court's Failure to Instruct on Provocation and Second Degree Murder Was Error.

It was also error to refuse a requested instruction that if the provocation is insufficient to reduce a murder to manslaughter, it may nevertheless reduce the murder

---

[12] We are aware that amplifying instructions such as the one discussed in *Wharton*, *supra*, 53 Cal.3d 522 need only be given upon request. (*People v. Guiuan* (1998) 18 Cal.4th 558, 570.) In our view, the "predictable conduct" instruction contemplated by the court here also was more akin to an amplifying instruction than to a general principle of law on which the court must instruct sua sponte. "Even if the court has no sua sponte duty to instruct on a particular legal point, when it does choose to instruct, it must do so correctly." (*People v. Castillo* (1997) 16 Cal.4th 1009, 1015.) In this case, where there was considerable evidence of provocatory acts over a period of time, a further amplifying instruction would have been required to correctly set the parameters of the predicable conduct principle.

from first to second degree. "Provocation of a kind, to a degree, and under circumstances insufficient to fully negative or raise a reasonable doubt as to the idea of *both* premeditation *and* malice (thereby reducing the offense to manslaughter) might nevertheless be adequate to negative or raise a reasonable doubt as to the idea of premeditation or deliberation, leaving the homicide as murder of the second degree; i.e., an unlawful killing perpetrated with malice aforethought but without premeditation and deliberation." (*People v. Thomas* (1945) 25 Cal.2d 880, 903; *People v. Carasi* (2008) 44 Cal.4th 1263,1306; *People v. Wickersham, supra,* 32 Cal.3d at p. 329; *People v. Valentine, supra,* 28 Cal.2d at p. 132.) "The existence of provocation and its extent and effect, if any, upon the mind of defendant in relation to premeditation and deliberation in forming the specific intent to kill, as well as in regard to the existence of malice (Pen. Code, § 188), constitute questions of fact for the jury and they should have been so advised." (*Thomas,* at pp. 903–904; see CALCRIM No. 522; CALJIC No. 8.71.)

The evidence adduced at trial about the long-simmering conflict between defendant and Green over their son's care and custody could have raised a reasonable doubt about the existence of premeditation and deliberation, one of the two theories of first degree murder on which the jury was instructed. Defense counsel properly objected to the trial court's revision of CALCRIM No. 522, which would have misdirected the jury to focus its attention solely on defendant as the initial aggressor, rather than permitting the jury consider whether defendant's conduct was a rash response to Green's provocatory conduct with respect to their son.[13]

---

[13] We do not agree with the concurrence that "whether the evidence of Green's conduct after Wright shot into his car was sufficient to require a provocation instruction for the purposes of a second degree murder is a closer call." (Conc. opn. of Humes, J., at p. 75.) In our view, any instruction based on the shots fired by Wright after Green got out of his car would be subject to the predictable conduct rule of the *Jackson-Rich* line of cases, regardless of her subjective state of mind.

The question remains whether the errors were prejudicial.[14]  Reversal is required only if " 'the court, "after an examination of the entire cause, including the evidence," is of the "opinion" that it is reasonably probable that a result more favorable to [defendant] would have been reached in the absence of the error.' "  (*People v. Wharton, supra,* 53 Cal.3d at p. 571, quoting from *People v. Watson* (1956) 46 Cal.2d 818, 836; see *People v. Breverman*, *supra*, 19 Cal.4th at p. 165; *People v. Rogers* (2006) 39 Cal.4th 826, 868.)  Under *Watson,* the court "may consider . . . whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak," that there is no reasonable probability the jury would have decided differently had the trial court instructed on the lesser included offense.  (*People v. Breverman,* at p. 177.)

The Attorney General argues any error in failing to instruct on heat of passion and provocation was harmless because "the evidence of heat of passion due to provocation was relatively weak. . . .  [T]here was no direct evidence of appellant's actual heat of passion or that Green actually provoked appellant's shooting."  She also argues any failure to instruct was harmless by virtue of the overwhelming evidence of lying in wait, and the jury's lying-in-wait special circumstance finding.

Although the evidence of defendant's actual state of mind was indirect, there was enough evidence from sources other than or in addition to defendant's testimony from which a properly instructed jury reasonably could have concluded that defendant in fact

---

[14] The Courts of Appeal are currently debating whether the erroneous failure to instruct on provocation/heat of passion manslaughter is evaluated for prejudicial error under *People v. Watson, supra*, 46 Cal.2d at p. 836, or *Chapman v. California* (1967) 386 U.S. 18, 24.  (See *People v. Thomas* (2013) 218 Cal.App.4th 630, 633, 641–645; *People v. Millbrook, supra*, 222 Cal.App.4th at pp. 1145–1146; *People v. Peau* (2015) 236 Cal.App.4th 823, 830–831.)  In this case, unlike in *Thomas*, *Millbrook*, and *Peau*, defendant has not argued *Chapman* is the correct standard of reversal.  It would not be appropriate for this court to weigh in on the debate when the issue has not be fully briefed by the parties.  (*People v. Moye, supra*, 47 Cal.4th 537, 558, fn. 5.)

was angry with Green (despite her protestations to the contrary), "wasn't thinking," and acted under the actual stress and provocation of Green's threats to take custody of her son away from her when she shot him. (*People v. Wickersham, supra,* 32 Cal.3d at p. 328; *People v. Barton, supra*, 12 Cal.4th at p. 202.) If not sufficient to negate malice and reduce the offense to manslaughter, it could well have been sufficient, especially in combination with the evidence of intoxication and mental disease, to negate premeditation and deliberation and reduce the offense to second degree murder. However, the evidence defendant acted in a heat of passion was relatively weak compared with the evidence that knowing Green's work schedule and post-work routine, she drove to the Pelican Loop parking lot and waited for him to come home, whereupon she sneaked up on him unaware and shot him while he was in his car.

Moreover, the jury was instructed in connection with premeditation and deliberation that "[a] decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated." (CALCRIM No. 521.) It was also instructed on lying in wait as an alternative theory of first degree murder liability and returned a true finding on the special circumstance allegation that she killed Green "by means of lying in wait." (CALCRIM No. 728.) " '[L]ying in wait [is] the functional equivalent of proof of premeditation, deliberation, and intent to kill.' [Citation.] Thus, a showing of lying in wait obviates the necessity of separately proving premeditation and deliberation" (*People v. Hardy* (1992) 2 Cal.4th 86, 162) or intent to kill (*People v. Ruiz* (1988) 44 Cal.3d 589, 614). Provocation cannot negate first degree murder by lying in wait. (*People v. Battle* (2011) 198 Cal.App.4th 50, 75.)

In this case, even if the jury theoretically could have found that provocation or heat of passion negated premeditation and deliberation, its special circumstance finding demonstrated beyond a reasonable doubt that it did not necessarily, or solely, rely on premeditation and deliberation to find first degree murder. In addition, the jury was instructed that intoxication and mental disease could be considered for the limited

51

purpose of deciding whether, at the time of the shooting, defendant acted with intent to kill, premeditation and deliberation, intended to make a surprise attack as required for first degree murder on a lying in wait theory, and whether defendant intended to kill Green by taking him by surprise as required for the special circumstance of lying in wait. (CALCRIM Nos. 625, 3428.)  Despite these instructions, the jury rejected the evidence showing those mental states were affected by defendant's mental impairments, strongly suggesting the jury also would have rejected the evidence those mental states were affected by heat of passion.  In our view, the failure to give an instruction relating provocation to second degree murder could not have been prejudicial in this case.

To be sure, before there can be a lying in wait finding, there must be a murder finding.  "To prove first degree murder of any kind, the prosecution must first establish a murder within section 187—that is, an unlawful killing with malice aforethought. [Citations.]  Thereafter, pursuant to section 189, the prosecution must prove the murder was perpetrated by one of the specified statutory means, including lying in wait, or 'by *any other kind* of willful, deliberate, and premeditated killing.' " (*People v. Stanley* (1995) 10 Cal.4th 764, 794.)

Here, the jury was instructed it could consider intoxication and mental disease "only in a limited way" that did not include their effects on implied malice.  (*People v. Saille, supra,* 54 Cal.3d at p. 1117.)  Unlike intoxication and mental disease, provocation and heat of passion can negate both implied malice and intent to kill.  (*People v. Lasko, supra,* 23 Cal.4th at pp. 108–111; *People v. Blakeley, supra,* 23 Cal.4th at pp. 89, 91; *People v. Breverman, supra*, 19 Cal.4th at p. 154.)  We are aware the first jury, which heard virtually the same evidence and *was* instructed on provocation/heat of passion as well as intoxication and mental disease, wrestled with implied malice in this case, and ultimately was unable to agree on a murder verdict.  However, from its questions, it appears the first jury's concerns may have been prompted by the connection between

52

implied malice and intoxication and mental disease, rather than between implied malice and provocation and heat of passion.  (See fn. 2, *ante*.)

*This* jury, however, must have believed the evidence showed defendant shot Green with "a state of mind equivalent to deliberation or premeditation" in order to return a true finding on the lying in wait special circumstance finding.  (CALCRIM No. 728.)  That finding cannot be reconciled with a finding she *also* lacked malice because Green's conduct provoked in her an "emotion so intense that an ordinary person would simply *react*, without reflection."  (*People v. Beltran, supra*, 56 Cal.4th at p. 949.)  Also, our Supreme Court has found that a lying in wait special circumstance finding renders the failure to instruct on provocation/heat of passion manslaughter harmless error.  (*People v. Cruz* (2008) 44 Cal.4th 636, 665.)  In short, while the jury should have been instructed on provocation and heat of passion, after close examination of the evidence and the jury's findings, we cannot conclude it is reasonably probable a result more favorable to defendant would have been reached in the absence of the error.  (*People v. Watson, supra*, 46 Cal.2d at p. 836; *People v. Cruz,* at p. 665 [intentional murder, perfecting escape and lying in wait special circumstance findings "negate any possibility that defendant was prejudiced from the failure to instruct on provocation/heat of passion or unreasonable self-defense theories of manslaughter."].)

## H.     *Exclusion of Green's Prior Aggressive Conduct and Statements Was Not Error.*

The trial court excluded evidence that (1) Green told Dr. Ferrante he "pushed" defendant when he found out she was pregnant in 2006 or 2007, and that in 2008 they pushed each other when they were both drunk ; (2) Green told his mother, "I could kill her," when he learned she was pregnant, and (3) Green was nicknamed "Maniac" as a teenager.

A trial court's evidentiary rulings admitting or excluding evidence are reviewed for abuse of discretion, " ' "and will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted

in a manifest miscarriage of justice." ' " (*People v. Geier* (2007) 41 Cal.4th 555, 585.)

Here, the trial court excluded the evidence of Green's moniker from his teenage years as too old (13 years had passed) and too ambiguous; his 2004 statement to his mother because it was too remote, never communicated to defendant, and never acted upon by Green; and the evidence of prior pushing incidents because defendant did not testify (at the first trial) that the pushing incidents were on her mind when she shot Green.

Evidence Code section 210 provides: " 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

The excluded evidence here was either not relevant to any disputed issue in the trial, or was insufficiently probative relative to its potential for prejudice and confusion of issues. While the pushing incidents may have been relevant in the abstract to self-defense and imperfect self-defense, defendant never indicated at either trial that the prior pushing incidents played any part in the shooting. Similarly, the prior threat communicated to Green's mother was not relevant because it could not have instilled fear of Green or informed defendant's mental state at the time of the shooting if she did not know of it. Finally, Green's teenage moniker could only have contributed to speculation. We see no abuse of discretion.

## I.     *Substantial Evidence Supports the Lying in Wait Special Circumstance Finding*.

"To prove lying in wait, the prosecution must prove there was a concealment of purpose, a substantial period of watching and waiting for a favorable or opportune time to act, and that immediately thereafter the defendant launched a surprise attack on an unsuspecting victim from a position of advantage." (*People v. Gurule* (2002) 28 Cal.4th

54

557, 630.)  Defendant argues there was insufficient evidence to support the lying in wait special circumstance because while "there was a 'waiting' by appellant, there was little evidence of 'watching':  she appears to have been asleep."  Also, she argues there was insufficient evidence of concealment.  We disagree.

" 'On appeal we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Gurule, supra,* 28 Cal.4th at p. 630.)  "The same rule applies to the review of circumstantial evidence.  'The court must consider the evidence and all logical inferences from that evidence in light of the legal definition of lying in wait.  [Citation.]  But it is the jury, not the appellate court, which must be convinced of the defendant's guilt beyond a reasonable doubt.  [Citation.]  Therefore, an appellate court may not substitute its judgment for that of the jury.  If the circumstances reasonably justify the jury's findings, the reviewing court may not reverse the judgment merely because it believes that the circumstances might also support a contrary finding.  [Citations.]' " (*People v. Poindexter* (2006) 144 Cal.App.4th 572, 577 [lying in wait theory of first degree murder].)

In this case, there was ample evidence from which a reasonable jury could find all the elements of the lying in wait special circumstance.  There was evidence defendant was still in love with Green (though she denied it) and jealous of his new relationship.  She bought a handgun, ammunition and a speed loader.  She took those items with her when she drove to Green's address in Pelican Loop.

She was familiar with his years-long routine of getting off work at midnight, buying a pack of cigarettes and a beer, and sitting in his parked car drinking and smoking, even though she claimed not to know whether that was still his routine.  She left her home in her mother's car, instead of the one she usually drove, in plenty of time to rent a motel room near her destination and get to Pelican Loop before Green returned home

from work.  Extensive surveillance video evidence established defendant's mother's car arrived at the motel at 10:34 p.m., left the motel at 11:54 p.m., and drove through the downtown area to Pelican Loop.  Defendant waited over 45 minutes before Green's car arrived at Pelican Loop at 12:41 a.m. on February 23.  He parked next to defendant's mother's car.  A reasonable jury could infer he was not expecting to see defendant at that time and did not recognize her mother's car, which defendant was counting on.  Defendant drove out of Pelican Loop with her car's lights off about nine minutes later, at 12:50 a.m., the same time a neighbor heard shots and a car speeding away.

From the ballistics and autopsy evidence, a rational jury could infer Green did not recognize the car defendant was in, did not see defendant approach him, and the first shot took him by surprise.  He was shot twice more in short order when he got out of the car: the neighbor heard one shot, a pause, then two more shots in quick succession.

Other than defendant's testimony that she fell asleep while she was waiting and fortuitously woke up when Green arrived, there was no evidence about defendant's state of watchfulness during the 45 minutes she waited in her car.  The jury was not required to accept her version of the facts, and apparently did not do so.  As defendant acknowledges, 45 minutes is a " 'substantial period of waiting.' " (*People v. Poindexter, supra*, 144 Cal.App.4th at p. 584.)  Moreover, the nine-or-so-minute time span between the time Green parked his car, took a sip of beer, and lit a cigarette—the beer was still in his mouth when his body was found—and the time defendant left Pelican Loop, supports a reasonable inference that defendant watchfully waited for the most opportune time to surprise Green, and concealed her person and her purpose from him until she shot him.  "The required concealment need not be physical.  It suffices if the defendant's purpose and intent are concealed by his actions or conduct, and the concealment of purpose puts the defendant in a position of advantage, from which the fact finder may infer that lying in wait was part of the defendant's plan to take the victim by surprise." (*People v. Ceja*

56

(1993) 4 Cal.4th 1134, 1140.)  Substantial evidence supports the jury's special circumstance finding.

## J.     *Jury Misconduct by Juror No. 12 Does Not Require Reversal.*

Defendant contends her state and federal constitutional rights to a fair trial by an impartial jury were violated by jury misconduct.  (U.S. Const., 6th & 14th Amends.; Cal Const., art I, § 16; Pen. Code, § 1181, subd. 3.)  In this case, after full briefing and an evidentiary hearing at which the offending juror testified, the trial court found Juror No. 12 had committed misconduct by posting and receiving comments about the trial on Facebook, but also found the presumption of prejudice had been rebutted.  The trial court denied defendant's new trial motion on that basis.  "We accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence.  [Citations.]  Whether prejudice arose from juror misconduct, however, is a mixed question of law and fact subject to an appellate court's independent determination."  (*People v. Nesler* (1997) 16 Cal.4th 561, 582.)

### 1. *Relevant Historical Facts*

On February 20 at 6:38 p.m., two hours after court adjourned until February 25, and the day on which defendant testified, Juror No. 12 posted the following comment on her Facebook page:  "WHOA….defendent (?) or defendant (?) or whatever…took the stand today.  Velly interesting!"  Several people "liked" and/or responded to the comment.  At 6:45 p.m., Mr. P. wrote:  "He's guilty.  Hang him."  At 6:52 p.m. Juror No. 12 wrote back:  "I have to keep an open mind until next week!!  They don't know how easy that is for a blonde . . . feel that breeze blowing thru every day.!!"  At 7:07 p.m. Ms. McK. posted:  "which trial?  Im [*sic*]watching the tearless Jody [*sic*] Arias describe how she killed her boyfriend is self-defense . . . yea right . . . the only time she cried is when she was discussing her own life . . . not one tear for him . . . psychopath. . . ."  Juror No. 12 responded at 7:18 p.m.:  "I have been on one over in Richmond since 1/22."

Several people responded to the length of the trial, or expressed interest in learning about the case when it was over.

The next day, Ms. McC. posted: "Hey Miss [Juror], are you off today or are you FBing while in court? Do they let you keep your phones with you?" Juror No. 12 responded: "Yeah, my mind is already made up so I am FBing. LOL! Since we are always off on Friday they are just going to wait until Monday to give us the case so we got today off. I never have my phone with me but the 3 times I did, [I] thought it was off & it rings!! Now when we go in, everyone looks at me & asks if my phone is off! I hand it to someone else to double check it.!" Later, Juror No. 12 added: "Everyday but Fridays to Richmond. Hopefully it will be done this next week!" Mr. McC responded: "[Juror]. . . this is your social gold ticket! You'll have a guaranteed invitation to every meaningful social event in Antioch (. . . that includes the possum round-up and stomp.) Nothing entertains like an inside look at the criminal just-ass system! Milk it, baby!"

Juror No. 12 filed a declaration under penalty of perjury and also testified under oath at the hearing on the motion for a new trial.

In her declaration, Juror No. 12 averred she believed she was complying with the court's order to not share information about the case because she posted no information she received in court, did not identify defendant, the nature of the case, or any evidence or facts. She did not post anything on Facebook while court was in session. She did not tell other jurors about her postings. Nothing that happened outside the courtroom affected her decision in the case. She did not make up her mind about the verdict until after she had discussed the case with the other jurors during deliberations. She deliberated fully with the other jurors. When she posted her "[v]elly interesting" comment she had not made up her mind and was careful not to post any details or information about the case. She did not know what caused Mr. P. to post, "He's guilty. Hang him," but she was careful not to give him any information. She explained her

58

duties as a juror by replying she had to keep an open mind until the following week and joking about being a blonde.

She was joking when she said her mind was made up. She emphasized she was joking by using "LOL," which means "laugh out loud." She was just letting off some steam and being a "smartass"; she was not being serious. She did not realize her comments were in violation of the court's instructions.

Juror No. 12's testimony was consistent with her declaration. She testified she recalled the judge telling the jury not to Facebook or share information about the case to others. She thought she was being faithful to the court's instructions by not discussing the facts of the case on Facebook. She did not think stating the defendant had taken the stand was discussing the case. She thought that fact was not a secret since there were other people in the courtroom. She now realized she had not been using her good judgment since her husband's recent death. She now understood posting her first comment on Facebook was inconsistent with her duties as a juror.

"Velly interesting" was a reference to Arte Johnson's skits on Rowan and Martin's *Laugh In* in the 1960's. That comment was her first post about the trial and not a response to another post. Mr. McC.'s posting about her social gold ticket was just "nonsense banter" she did with a few people on Facebook to keep her spirits up; she did not take it as having anything to do with her involvement in the trial. She lived in Antioch; Mr. McC. did not. Mr. McC. was teasing her about Antioch being the kind of place where the social scene included "possum stomps." When she wrote "my mind's made up" she was joking, as indicated by "LOL," which everyone knows means "laugh out loud." At that point, she did not know what the jury was supposed to be deciding, since they were told in the very beginning that defendant admitted shooting the victim.

She honestly did not even take in the comment about the "just-ass" system. At the time, it made no impact on her.

Everything she put in her declaration was true. She apologized for "being so stupid, for wasting everyone's time."

## 2. *The Trial Court's Ruling*

The trial court issued a detailed ruling, indicating the court had "looked at every single case in the United States relating to Facebook posts and misconduct." The court found Juror No. 12 had disobeyed the court's order and engaged in juror misconduct, but also found Juror No. 12 "very credible that she didn't think that what she was doing was wrong. [¶] So I don't find that there was an intentional violation of the Court's instructions that would suggest a general disregard of her duties as a juror in this case."

Distinguishing *People v. Cissna* (2010) 182 Cal.App.4th 1105, on which the defense relied, the court found the presumption of prejudice had been rebutted in defendant's case because the comments were isolated and "[n]othing whatsoever about the merits of the case, about the juror's impressions of the case, of why the defendant decided to testify or didn't decide to testify, or what it meant. There is nothing about that. There is banter. There is silly banter. Most of it vacuous."

The court viewed the reference to the Jodi Arias case as unrelated to anything, unlike the reference to O.J. Simpson in an unnamed case. The court viewed the other responding Facebook posts as "generic cynical comments" that were not directed at the evidence in defendant's case, and were not extrajudicial information about defendant's case, "because the juror had not disclosed anything about those things." The court compared the responding comments to "a generic rant that one sees all the time in the newspaper or hears at cocktail parties."

The court stated in conclusion: "Juror No. 12 never expressed any bias in any statements that she made on Facebook. She never revealed that she had made up her decision in any way, but a joking way in relation to whether she could Facebook in court. [¶] She did not engage any of the Facebook friends with any discussions of the facts [or] the merits. She said she was kidding when she [said she] made up her mind. When she

60

said she made up her mind, she said that at the time with the 'LOL.' She confirmed that she had to keep an open mind. She was credible as a witness here in court. Confirmed that she hadn't made up her mind because she didn't understand the law well enough, and why in a case where someone admitted the shooting that it would be a triable issue. [¶] She needed to hear the law on that before she could make up her mind. That's what she said and I believe that. I think she's a credible witness on that point, and I don't believe that there is any substantial likelihood that she rendered a verdict based on anything but the evidence in this case. [¶] She got no external information, she did not reveal anything about her thoughts about the case or what the case was about at all, and so I do find that the presumption of prejudice has been rebutted."

3. *Analysis*

" 'It is misconduct for a juror to consider material [citation] extraneous to the record. [Citations.] Such conduct creates a presumption of prejudice that may be rebutted by a showing that no prejudice actually occurred.' [Citation.] '[T]he extraneous material to which jurors are exposed must be inherently likely to prejudice a juror, or there must be facts from which it can be concluded that there was substantial likelihood of actual bias.' " (*People v. Montes* (2014) 58 Cal.4th 809, 895.) "[J]uror bias exists if there is a substantial likelihood that a juror's verdict was based on an improper outside influence, rather than on the evidence and instructions presented at trial, and the nature of the influence was detrimental to the defendant." (*People v. Cissna*, *supra*, 182 Cal.App.4th at p. 1116.) "[T]he test for determining whether juror misconduct likely resulted in actual bias is 'different from, and indeed less tolerant than,' normal harmless error analysis. [Citations.] If the record shows a substantial likelihood that even one juror 'was impermissibly influenced to the defendant's detriment,' reversal is required regardless of whether the court is convinced an unbiased jury would have reached the same result." (*Id.* at p. 1117.)

Defendant argues Juror No. 12's failure to comply with the court's instructions casts serious doubts on her willingness to follow the court's other instructions. We disagree. (*People v. Cissna, supra*, 182 Cal.App.4th at p. 1118.) The trial court expressly addressed this claim and decided, as a factual matter, that Juror No. 12 was "very credible that she didn't think that what she was doing was wrong. [¶] So I don't find that there was an intentional violation of the Court's instructions that would suggest a general disregard of her duties as a juror in this case."

The record supports the trial court's decision. Juror No. 12 testified she did not think reporting on Facebook that defendant had taken the stand was secret, or the same as discussing the facts of the case, and she had been very careful not to say anything more about the case in her followup posts. The total number of Facebook posts in the thread were few. They were not daily or ongoing posts. The juror did not repeat the offense. Plus, the juror explained that she had been suffering lapses in good judgment since her husband's recent death. There is no basis in the record for us to infer, contrary to the trial court, that Juror No. 12 was a scofflaw when it came to court orders.

Next, defendant argues the persons who posted comments in response to Juror No. 12's comment acted as unsworn "13th juror[s]." (*People v. Cissna, supra*, 182 Cal.App.4th at p. 1120.) We reject this claim because Juror No. 12 did not say anything substantive about the facts of the case. Therefore, the other Facebook posters had nothing substantive to say back to her about the case. We agree with the trial court the posters' comments about a notorious criminal trial and the criminal justice system had more in common with newspaper editorials and cocktail party banter than with "deliberative-type discussions." (*Ibid.*)

Finally, defendant argues that Ms. McK.'s post about the Jodi Arias trial "is particularly troubling because it appears to contradict Juror No. 12's claim in her declaration that she did not discuss the facts of the case with anyone." This argument assumes defendant's case shares certain similarities with the Jodi Arias case, and that

62

Juror No. 12 discussed those asserted similarities in a prior, undisclosed Facebook post. The record does not support these inferences. First, Juror No. 12 was questioned by the court about her "[v]elly interesting" post. She testified nothing preceded that comment, which was posted at 6:38 p.m. on February 20. She also testified the two pages of posts before the court were "all of the statements [she] made on [her] Facebook page relating to this trial." The record suggest the trial court found Juror No. 12 credible on this point.

Furthermore, the content and timing of Ms. McK's responding post about Jodi Arias suggest she may have been watching some evening broadcast about the Arias case, as she was posting her comment. At 7:07 p.m. Ms. McK. posted: which trial? *Im* [*sic*] *watching the tearless Jody* [*sic*] *Arias . . . .* [italics added]." Moreover, Juror No. 12's response—"I have been on one over in Richmond since 1/22"—suggests she had *not* already told Ms. McK. about serving as a juror in a trial, and conveyed no identifying details. Again, we see no basis in the record to infer Juror No. 12 was lying when she testified she had no Facebook communications about the trial other than the ones before the court.

Based on our independent review of the record, we conclude Juror No. 12's Facebook posts did not reveal she was biased against defendant, nor were the responding posts likely to prejudice her as a juror. We conclude there was no substantial likelihood that Juror No. 12's verdict was based on an improper outside influence, rather than on the evidence and instructions presented at trial, or that the nature of the influence was detrimental to the defendant. Therefore, the trial court did not err in denying defendant's motion for a new trial based on juror misconduct.

## DISPOSITION

The judgment is affirmed.

_____
DONDERO, J.

I concur:


_____
MARGULIES, J.


A139881

HUMES, P.J., Concurring.

Jennell Wright shot Le'Mar Green while he was sitting in his car, minding his own business.  The two had had no direct interaction for two-and-a-half days before the shooting, and the only reason they were together at the time of the shooting was because Wright drove herself to Green's residence, parked her car outside, and waited for him to return home from work.  The majority concludes that the trial court erred by not giving heat-of-passion and provocation instructions because of the evidence presented about the estranged couple's acrimonious history, which included conflicts about child rearing and custody.  According to the majority, Wright could have shot Green in a heat of passion or without premeditation as a result of provocation that "developed over a 'provocatory' period."  Although I agree that a course of provocatory conduct can give rise to the need for such instructions in some circumstances, I disagree that those circumstances are present here.  I therefore do not believe the trial court erred.

The duty to instruct on the heat-of-passion form of voluntary manslaughter or to give "a [requested] pinpoint instruction on the effect of provocation" on the degree of murder arises when substantial evidence is presented to support such an instruction. (*People v. Ward* (2005) 36 Cal.4th 186, 214; *People v. Breverman* (1998) 19 Cal.4th 142, 162.)  Only the "bare legal sufficiency"—not the weight—of the evidence is considered. (*Breverman*, at p. 177.)  Still, " 'the existence of "*any* evidence, no matter how weak" will not justify instructions on a lesser included offense [or a pinpoint instruction on provocation], [and] such instructions are required [only] whenever [the] evidence . . . is "substantial enough to merit consideration" by the jury.' " (*People v. Moye* (2009) 47 Cal.4th 537, 553, italics in original; *People v. Marshall* (1997) 15 Cal.4th 1, 39.)

Substantial evidence of provocation may require jury instructions on voluntary manslaughter, the effect of provocation on the degree of murder, or both, depending on

65

the nature of the provocation. For a killing to be reduced to voluntary manslaughter, both " 'provocation *and* heat of passion must be affirmatively demonstrated.' " (*People v. Steele* (2002) 27 Cal.4th 1230, 1252, italics in original; see also Pen. Code, §§ 188, 192, subd. (a).) First, there must be evidence that the defendant actually killed in a heat of passion. (*People v. Beltran* (2013) 56 Cal.4th 935, 951.) This subjective component is not met "[i]f sufficient time has elapsed for one's passions to 'cool off' and for judgment to be restored." (*Ibid.*) Second, there must be evidence of provocation that would have "render[ed] an ordinary person of average disposition [in the defendant's position] 'liable to act rashly or without due deliberation and reflection, and from this passion rather than from judgment.' " (*Id.* at pp. 956-957.) The provocation "must be caused by the victim [citation], or be conduct reasonably believed by the defendant to have been engaged in by the victim." (*People v. Lee* (1999) 20 Cal.4th 47, 59.) The objective test for adequate provocation is not whether the victim's conduct would have moved an ordinary person to *kill* but whether it "would cause an emotion so intense that an ordinary person would simply *react*, without reflection. . . . [T]he anger or other passion must be so strong that the defendant's reaction bypassed [his or her] thought process to such an extent that judgment could not and did not intervene." (*Beltran*, at p. 949, italics in original.) A person who kills with such a state of mind "lacks malice and is guilty not of murder but of the lesser offense of voluntary manslaughter." (*People v. Lasko* (2000) 23 Cal.4th 101, 108.)

When evidence of some provocation is presented, but it is insufficient to support a conviction of voluntary manslaughter because the provocation "would not [have caused] an average person to experience deadly passion" (*People v. Hernandez* (2010) 183 Cal.App.4th 1327, 1332), a killing may still be reduced from first to second degree murder if the provocation "played a role in preventing the defendant from premeditating and deliberating." (*People v. Rogers* (2006) 39 Cal.4th 826, 880.) For an instruction to be required on provocation's effect on the degree of murder, "the evidence of provocation

[must be sufficient to] justify a jury determination that the accused had formed the intent to kill as a direct response to the provocation and had acted *immediately*," i.e., without premeditation or deliberation. (*People v. Wickersham* (1982) 32 Cal.3d 307, 329, italics added.) Unlike the provocation required to reduce a killing to voluntary manslaughter, which *objectively* must have been sufficient to have caused an ordinary person to react without reflection, the provocation required to reduce a killing to second degree murder need only have "preclude[d] the defendant from *subjectively* deliberating or premeditating." (*Hernandez*, at p. 1332, italics added; *People v. Fitzpatrick* (1992) 2 Cal.App.4th 1285, 1295-1296 [rejecting argument that "jury must apply an objective standard of provocation to reduce first degree murder to second degree murder"]; see also *People v. Ward*, *supra*, 36 Cal.4th at p. 215 ["The evidentiary premise of a provocation defense is the defendant's emotional reaction to the conduct of another, which emotion may negate a requisite mental state"].)

Applying these legal standards in this case, the questions we must resolve are (1) whether a heat-of-passion instruction was required for voluntary manslaughter because a reasonable jury could have concluded that Green's actions aroused in Wright a passion that would have eclipsed the judgment of an ordinary person (*People v. Beltran, supra,* 56 Cal.4th at p. 950) and (2) whether a provocation instruction for second degree murder was required because a reasonable jury could have concluded that Green's actions caused Wright to form an intent to kill upon which she acted immediately, i.e., without premeditation. (*People v. Wickersham, supra,* 32 Cal.3d at p. 329.) To answer these questions, we need to consider two sets of facts. The first set, which includes the facts relied upon by the majority in reaching its conclusions, is the "abundant evidence adduced at trial about the acrimonious relationship between [Wright] and Green, particularly concerning their ongoing custody battle over their son." The second set is the events between the shot Wright fired into Green's car and the shots she fired that killed Green. I therefore turn to examine both sets of facts.

67

A.      *The Couple's Acrimonious Relationship and Conflicts About Their Child's Custody and Rearing.*

There is no question that plenty of evidence was presented that Wright and Green had a relationship marked by disagreements and conflict, including evidence that Wright was specifically angered by Green's relationship with his new girlfriend and his perceived failure to fulfill his parental responsibilities. But this evidence, in my view, does not constitute substantial evidence upon which a reasonable jury could have concluded that Green's conduct was sufficiently provocatory to have either roused in an ordinary person a passion eclipsing judgment or caused Wright to kill immediately, without premeditation.

Green and Wright's last face-to-face interaction before the shooting was when Green picked up their child from Wright's home on Saturday, February 20. At the first trial, Wright testified that she and Green did not argue then. Wright's sister Joann, however, told the police that at that time, " '[Wright] was just real talking nasty to [Green] and trying to provoke him to say stuff.' " Joann remembered thinking that she hoped Green did not say anything to Wright because, if he were to do so, the couple would argue. No other evidence was presented about any conflict between Wright and Green at the time Green picked up their child or during the rest of the weekend.

Two days later, at around 2:30 p.m. on Monday, February 22, Green returned the child to Wright's residence, but the two adults had no contact then because Wright was out running errands. The exact time that Wright returned home is unclear, but it was sometime before 5:00 p.m. She testified that when she arrived, she became "concerned" because the child was wearing a diaper instead of a pull-up. She was also "concerned" that he was wearing clothes she had not bought for him and that the clothes she had packed were not in his bag, making her think that Green was keeping them as part of a plan to take their child away from her. Joann characterized Wright as being "upset," but

there is no evidence that the child's appearance provoked an emotion any more intense than that.

Hours later, around 10:00 p.m., Wright left her residence, drove around on the freeway, and checked into a motel near Green's residence in Pittsburg. She had been drinking and was contemplating suicide, but she testified that she also "wanted to talk to [Green] about his threats [to take their child] away from [her]" and headed to Pittsburg for that reason. She denied, however, that she was thinking about killing Green. After drinking more alcohol, taking "a couple of sips" of antifreeze, and taking Vicodin "to start the process of killing [herself]," Wright fell asleep at the motel.

She eventually woke up and left the motel, still feeling that she needed to talk to Green about his threats to take their child. She drove to Green's residence, parked her car, drank more alcohol, and fell asleep again. When she woke up, Green had returned. She waited another five minutes, got out of her car, and approached Green's car.

Then, around 12:50 a.m. on February 23, Wright fired a shot into the driver's-side window, shattering it. The evidence conflicts as to whether Green saw her approach and asked her what she was doing there, a story she recounted to the police but later denied, or whether, as she testified, she shot at him immediately after he began to turn his head. Her testimony about her motive for firing the first shot was also contradictory, but she specifically denied that she was intending to kill Green, thinking of his threat to take their child, or otherwise feeling angry or upset.

In my view, nothing in the evidence up to this point could have allowed a reasonable jury to conclude that the judgment of an ordinary person would have been eclipsed by passion or that Wright formed an intent to kill upon which she immediately acted in response to provocation by Green. Days had passed since the two had had any face-to-face interaction—a period in which the only person potentially being provocative was Wright; hours had passed since Wright had returned home and became "upset" upon

69

seeing their child; and Green was doing nothing except sitting in his car when she approached and shot at him.[15]

The majority points to a line of decades-old cases holding that provocation need not arise from a "sudden and heightened instigative situation[]" but can build up over a period of time. None of these cases is controlling here, and they do not stand for the proposition, suggested by the majority's opinion, that people can exist in a prolonged passionate state about a bad relationship and be entitled to a heat-of-passion instruction when tried for killing a former partner whom they seek out or happen upon. It is true that the evidence in these cases showed, as the evidence shows here, a course of provocation that built up over time. But in these cases, unlike here, the built-up provocation culminated in *some* event involving the killer and victim that—even if insufficient on its own to have necessitated a heat-of-passion or provocation instruction—caused a passionate or immediate reaction resulting in the killing.

Three of the cases involved a killing that occurred as the defendant and victim were actively fighting. *People v. Borchers* (1958) 50 Cal.2d 321 held that the defendant could have killed his girlfriend in a heat of passion roused by a series of events, including his girlfriend's admitted infidelity, remarks about wishing to be dead, attempt to jump from a moving car, and repeated urgings for him to kill her. (*Id.* at pp. 328-329.)

---

[15] The majority recognizes that "the last provocatory act" possible was Green's drop-off of their child on Monday afternoon. It contends that heat-of-passion and provocation instructions were nevertheless required because "the evidence showed [Wright] spent Sunday and Monday stewing in her own juices" and the jury was entitled to determine whether there was a sufficient cooling-off period or whether the provocation prevented Wright from killing with premeditation. But I view the passage of time between the drop-off and the killing as significant for two reasons. First, even if the drop-off caused a passionate response in Wright, insufficient evidence was presented that she was *still* under the influence of that emotion when she fired the first shot. Second, even if eight or so hours is not long enough to establish as a matter of law that Wright did not act in a heat of passion, it *is* long enough to establish as a matter of law that she was not entitled to a provocation instruction because she did not kill as an *immediate* response to provocatory conduct.

70

Immediately before the killing, the victim taunted the defendant by giving him a gun and saying, " 'Go ahead and shoot, what is the matter, are you chicken[?]' " (*Id.* at p. 326.) Similarly, *People v. Berry* (1976) 18 Cal.3d 509 held that a husband who killed his wife could have been roused to a heat of passion by a course of conduct, including his wife's sexual taunts and incitements, alternating acceptance and rejection of him, and repeated references to involvement with another man. (*Id.* at p. 516.) As in *Borchers*, the victim did something to provoke the defendant immediately before the killing: she asked him if he had come to their apartment to kill her, started screaming even though he said he wanted only to talk, and "struggled" with the defendant after he tried to quiet her. (*Berry*, at p. 514.) Finally, in *People v. Wharton* (1991) 53 Cal.3d 522, the defendant killed his girlfriend by hitting her with a blunt instrument after she threw a book at him during a drunken argument. At trial, the defendant's theory was that "no single action on the part of the victim provoked the fatal blow but that the book-throwing incident was merely the culmination of [the defendant's] pent-up frustration and anger emanating from his ongoing dysfunctional relationship with the victim." (*Id.* at p. 571.) The court concluded that the jury should have been instructed that "legally adequate provocation could occur over a considerable period of time." (*Ibid.*)

In the final case, *People v. Bridgehouse* (1956) 47 Cal.2d 406, the defendant's wife admitted to the defendant that she had been unfaithful and often discussed the affair with him. (*Id.* at pp. 407-408.) The defendant sought a restraining order to prevent her from associating with her lover in the presence of her and the defendant's young son. (*Id.* at pp. 408-409.) A few days later, the defendant shot and killed the lover when the defendant arrived at his mother-in-law's home with his son and unexpectedly came upon the lover, who was living there. (*Id.* at p. 409.) The court concluded that these circumstances constituted "adequate provocation to provoke in the reasonable man such a heat of passion as would render an ordinary man of average disposition likely to act rashly or without due deliberation and reflection [citation]." (*Id.* at pp. 413-414.)

71

The continued vitality of *People v. Bridgehouse*, *supra*, 47 Cal.2d 406 is dubious since it was the *wife*'s conduct, not the victim's, that was provocatory, and the defendant specifically testified that he did not "resent[]" the victim or "fe[el] angry" toward him.[16] (*Id.* at pp. 411-412; cf. *People v. Lee*, *supra*, 20 Cal.4th at p. 59 [provocatory conduct "must be caused by the victim [citation], or be conduct reasonably believed by the defendant to have been engaged in by the victim"].)  But even if a course of provocatory conduct by a spouse that culminates in the shock of seeing the spouse's lover in an unexpected place is sufficient provocation to reduce the killing of the lover to voluntary manslaughter, what happened here is not analogous:  there is absolutely no evidence that Green did *anything* to spark an emotional response from Wright before she shot into his car.

I have no quarrel with the majority that " 'long continued provocatory conduct' " matters in evaluating whether a heat-of-passion instruction must be given (italics omitted), but in my view there still must be *something* when the killing occurs—certainly something more than the victim's just quietly sitting in his car, by his home, minding his own business—that stimulates the passionate emotion or immediate response of the killer.  My reading of the cases relied upon by the majority is that they make the simple and reasonable point that the effect of a victim's actions before the killing must be considered in the *context* of any course of provocatory conduct by the victim.  This means that an act by the victim that, standing alone, would be insufficient to require

---

[16] Like *People v. Borchers*, *supra*, 50 Cal.2d 321 and *People v. Berry*, *supra*, 18 Cal.3d 509, *People v. Bridgehouse*, *supra*, 47 Cal.2d 406 includes obliquely sexist reasoning.  If the defendants in these cases had been women, would the courts have so quickly concluded that ordinary people in their position would have had their judgment eclipsed by passion due, in significant part, to their partners' infidelity?  The majority suggests in footnote 8 that passion may develop and be expressed differently in women.  But even if this is so, I would still conclude that Wright was not entitled to a heat-of-passion instruction because Green's conduct before the shooting was insufficient to prompt a passionate response in any reasonable person, woman or man, in Wright's circumstances.

72

instructions on heat of passion or provocation, such as throwing a book (see *People v. Wharton, supra,* 53 Cal.3d at p. 571), might be sufficient when viewed as the culmination of a history of ongoing conflict and simmering emotions. But by not requiring evidence of *any* instigative circumstances, the majority essentially holds that such instructions must be given whenever evidence is presented that the killer and victim had a troubled relationship involving charged issues, such as infidelity or child custody. I do not believe that such an expansive holding is either compelled or proper—particularly when, as here, the killer effectively ambushes the victim. (See, e.g., *People v. Carasi* (2008) 44 Cal.4th 1263, 1273-1276, 1306-1307 [no substantial evidence of provocatory conduct by victim requiring heat-of-passion and provocation instructions where defendant stabbed ex-girlfriend after long period of custody and child-support disputes involving their son].)

B.      *Green's Conduct Between the First Shot and the Fatal Shots.*

Since the evidence of Wright and Green's acrimonious relationship and disagreements about their child up to the time Wright shot into Green's car would not have allowed a reasonable jury to find provocation sufficient to reduce the killing to voluntary manslaughter or second degree murder, I turn to whether sufficient evidence of provocation was presented based on Green's conduct between the first shot and the deadly shots. These facts are not the basis for the majority's conclusion that heat-of-passion and provocation instructions were required, but they are among the facts relied upon by Wright. She argues that "[c]ritical issues for the murder charge were whether or not Green launched a deadly attack on [her] after the window was shot out and whether he needed to pursue such an attack if [she] was, as she testified, backing away. Based on the history of violence between the parties, heat-of-passion may have come into play in [her] decision to fire the second and third rounds." I do not buy it.

Wright testified that in response to the shot into his car, Green jumped out, leaned forward and tried to grab her, swore at her, and swung a fist at her. She testified that in those moments she was afraid but not angry. To conclude that Green's reaction to having

73

been shot at was sufficiently provocative to require a heat-of-passion instruction turns provocation principles on their head. After all, who provoked whom here? Green's advances on Wright after she shot at him were perfectly predictable and eminently justifiable. And no evidence was presented that Wright fired the fatal shots for any reason other than Green was advancing toward her.

A line of cases leaves little doubt that the evidence of Green's actions after Wright shot into his car was insufficient to require a heat-of-passion instruction. In *People v. Jackson* (1980) 28 Cal.3d 264, our state Supreme Court held that evidence "that [the] defendant may have become enraged and brutally attacked and killed one of his elderly victims because she was awakened during the burglary and began to scream" was insufficient to show that the defendant killed in a heat of passion caused by sufficient provocation. "No case has ever suggested . . . that such predictable conduct by a resisting victim would constitute the kind of provocation sufficient to reduce a murder charge to voluntary manslaughter." (*Id.* at p. 306.) The court applied the same principle in *People v. Rich* (1988) 45 Cal.3d 1036, where it held "that the victims' resistance to the criminal act of rape [was] 'predictable conduct' and [was] insufficient provocation to negate malice" (*id.* at pp. 1112-1113), and in *People v. Souza* (2012) 54 Cal.4th 90, where it held that the victim's rising from the couch and reaching for one of the defendants, "one of three armed unknown men bursting into the home[,] constituted predictable and reasonable conduct by a victim resisting felonious assault, and not provocation sufficient to merit a manslaughter instruction." (*Id.* at pp. 116-117; see also *People v. Johnston* (2003) 113 Cal.App.4th 1299, 1313 [no heat-of-passion instruction warranted where the "[d]efendant was 'culpably responsible' for [his] altercation" with the victim; having provoked a fight with the victim, the defendant could not "be heard to assert that *he* was provoked when [the victim] took him up on the challenge"], italics in original.) Indeed, even if Wright had not provoked Green first by shooting at him, no evidence indicated that Green had a gun or any other weapon when he advanced on

74

Wright. Thus, and at most, he threatened Wright with nothing more than an assault, which is insufficient provocation to warrant a heat-of-passion instruction—even where there is evidence that the defendant and victim have a pre-existing acrimonious relationship. (*People v. Gutierrez* (2009) 45 Cal.4th 789, 798-799, 825-827.)

Whether the evidence of Green's conduct after Wright shot into his car was sufficient to require a provocation instruction for purposes of second degree murder is a closer call. In *People v. Rich*, *supra*, 45 Cal.3d 1036, our state Supreme Court held that analogous evidence was insufficient to require even a provocation instruction, not just a heat-of-passion instruction. (*Id.* at pp. 1112-1113.) But in determining whether a victim's resistance is provocation sufficient to reduce a killing to second degree murder, the court stated that "the inquiry is whether the ordinary person would 'explode' because the victim resisted" and a "defendant's subjective response to . . . victims' resistance" is irrelevant. (*Id.* at p. 1112.) This statement is at odds with the cases discussed above, including other Supreme Court decisions, establishing that the provocation needed to reduce a killing to second degree murder is judged only subjectively. Moreover, it is unclear whether *Rich*'s holding on the provocation instruction was based on the principle that a victim's predictable resistance *never* suffices to reduce the degree of murder or on the lack of evidence *in that case* that the victims had resisted. (See *id.* at pp. 1112-1113.)

Unless *People v. Rich*, *supra*, 45 Cal.3d 1036 stands for the principle that a victim's predictable resistance can never constitute provocation sufficient to prevent a defendant from deliberating and premeditating, it is plausible to suggest that a reasonable jury here could have concluded, if it accepted Wright's testimony, that Wright did not form the intent to kill until Green advanced towards her, at which point she became scared and immediately shot him. But we need not decide whether a provocation instruction was required on this basis because Wright has not argued this point. In her briefing, she argues that CALCRIM No. 522, the standard instruction on provocation's effect on the degree of murder, should have been given, but she incorrectly characterizes

it as an instruction on voluntary manslaughter, exclusively addresses the legal standards for voluntary manslaughter, and fails to discuss with any particularity how the evidence could have supported a provocation instruction.

Nor is such an argument the basis for the majority's conclusion that a provocation instruction was required. The majority concludes that "[t]he evidence adduced at trial about the long-simmering conflict between [Wright] and Green over their son's care and custody could have raised a reasonable doubt about the existence of premeditation and deliberation." I cannot agree that this is a valid reason for concluding that the trial court erred. For a provocation instruction to be warranted, a defendant must kill "immediately" upon "form[ing] the intent to kill as a direct response to the provocation." (*People v. Wickersham*, *supra*, 32 Cal.3d at p. 329.) Here, there was no evidence upon which a reasonable jury could have concluded that Wright shot Green immediately after forming an intent to kill *prompted by the couple's acrimonious relationship*.

In my view, when a person ambushes a victim with deadly force (as Wright did), the victim attempts an unsuccessful defense (as Green did), and the attacker responds to the unsuccessful defense by killing the victim (as Wright did), the killer is not entitled in an ensuing murder trial to have the jury instructed on heat of passion or provocation simply because the two had an acrimonious relationship that included disputes about their child. I disagree with the majority's opinion to the extent it suggests otherwise.


_____

Humes, P.J.


76

| | |
|---|---|
| Trial Court | Contra Costa County Superior Court |
| Trial Judge | Hon. Leslie G. Landau |
| Counsel for Defendant and Appellant Jennell Renee Wright | Dirck Newbury<br>By appointment of the Court of Appeal under the First District Appellate Project, Independent Case System |
| Counsel for Plaintiff and Respondent People of the State of California | Kamala D. Harris, Attorney General Dane R. Gillette and Gerald A. Engler, Assistant Attorneys General, Catherine A. Rivlin and Allen R. Crown, Deputy Attorneys General. |